



IN THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

| | |
|---|---|
| **(1) STEFNIE HAWLEY, individually and as Legal Guardian of THOMAS HAWLEY,**<br><br>        **Plaintiff,**<br><br>**vs.**<br><br>**(1) BOARD OF TRUSTEES FOR THE OKLAHOMA COUNTY CRIMINAL JUSTICE AUTHORITY,**<br><br>**(2) CITY OF DEL CITY,**<br><br>**(3) DEL CITY POLICE DEPARTMENT,**<br><br>**(4) TURN KEY HEALTH CLINICS, LLC,**<br><br>**(5) WILLIAM COOPER, D.O.**<br><br>**(6) BRANDI GARNER, individually,**<br><br>**(7) FLOYD A. EASON,**<br><br>**(8) MELISSA JONES,**<br><br>**(9) MIKE CANTRELL,**<br><br>**(10)   LOYD BERGER,**<br><br>**(11)   KRISTA WAGGONER, individually,**<br><br>        **Defendants.** | FILED IN DISTRICT COURT<br>OKLAHOMA COUNTY<br><br>NOV -8 2024<br><br>RICK WARREN<br>COURT CLERK<br>111 _____<br><br><br><br>CJ - 2024 - 7 1 8 8<br><br>Case No. |

## COMPLAINT

COMES NOW Plaintiff Stefnie Hawley, as Legal Guardian of Thomas Hawley, for their

action against Defendants Board of Trustees for the Oklahoma County Criminal Justice

Authority, City of Del City, Del City Police Department, Brandi Garner, Floyd A. Eason, Melissa

Jones, Mike Cantrell, Loyd Berger, Krista Waggoner, William Cooper, and Turn Key Health Clinics, LLC, alleges and states as follows:

## INTRODUCTION

This civil rights action seeks damages from individual detention officers, from Brandi Garner, Floyd A. Eason, Melissa Jones, Mike Cantrell, Loyd Berger, Krista Waggoner, and William Cooper, and from the following entities: the Board of Trustees for the Oklahoma County Criminal Justice Authority, the City of Del City, the Del City Police Department, and Turn Key Health Clinics, LLC. The Plaintiff claims damages for violations of his Fourth and Fourteenth Amendment rights under the United States Constitution, federal statutory civil rights under 42 U.S.C. § 1983, and rights under the Oklahoma Governmental Torts Claims Act under 51 O.S. § 151. These violations occurred in connection with the placement of Thomas Hawley ("Thomas") in a general population cell with a known rapist, resulting in Thomas being sexually assaulted.

## JURISDICTION, VENUE, AND THE PARTIES

1. All of the acts complained of occurred in Oklahoma County, State of Oklahoma.

2. Jurisdiction in this matter is proper in the District Court of Oklahoma County, State of Oklahoma.

3. Plaintiff, Thomas Hawley, is a citizen and resident of Oklahoma County, Oklahoma, at all times material hereto.

4. Plaintiff, Stefnie Hawley, is the Legal Guardian of Thomas Hawley and is a citizen and resident of Oklahoma County, Oklahoma, at all times material hereto.

5. Defendant City of Del City is a municipal corporation located within the State of Oklahoma and existing by virtue of the laws, Constitution, and Statutes thereof. Del City

maintains supervisory responsibilities and control over the Del City Police Department through the City Manager. At all times relevant to the allegations in this Petition, Del City was the employer of Defendants Berger, Cantrell and Eason.

6. Defendant Floyd A. Eason, in his individual capacity, at all times relevant to the allegations in this complaint, was employed by Del City as the Mayor.

7. Defendant Loyd Berger, in his individual capacity, at all times relevant to the allegations in this complaint, was employed by Del City as the Chief of Police. Berger was directly involved in the training, monitoring, observing, supervising, disciplining, and/ or controlling of the Del City Police Officers.

8. Defendant Mike Cantrell, in his individual capacity, at all times relevant to the allegations in this complaint, was employed by Del City as the City Manager.

9. Defendant Trust is a public trust created for the furtherance of purported public functions pursuant to 60 O.S. § 176, *et seq.* Trust was created by a Trust Indenture in 2019. Under the Indenture, Trust is to "assist" Oklahoma County in its stated objective of operating the Oklahoma County "Jail Facilities" which includes the OCDC.

10. Through the Indenture, Trust was delegated the responsibility of developing policies and procedures for the administration of the OCDC and management of the operations of the OCDC. Trust took control over the OCDC on June 1, 2020.

11. Defendant Board of Trustees for the Oklahoma County Criminal Justice Authority ("Board") is and was at all times relevant hereto responsible for the training and supervision of Defendant Waggoner.

12. At all times relevant hereto, Defendant Trust and its officers/employees were acting under color of state law.

13. Defendant Trust was further responsible for the supervision of Defendant Turn Key in its role as Trust's contractor for provision of medical care at the detention center.

14. Oklahoma County delegates final decision-making authority to Trust to establish policy with regard to operation of the OCDC, including the detention and medical care for physically ill and/ or mentally ill detainees.

15. Defendant Brandi Garner ("Administrator") was, at all times relevant hereto, the Jail Administrator of the OCDC and thus responsible for the operation of the OCDC.

16. Defendant Administrator is and was, at all times relevant hereto, responsible for the training and supervision of Defendant Waggoner.

17. Administrator is sued both in her individual capacity and her official capacity for acts performed while she was the Administrator overseeing the OCDC.

18. At all times relevant herein, Administrator was acting under the color of law and within the course and scope of her employment with the Trust.

19. Administrator was further responsible for the supervision of Defendant Turn Key in its role as Trust's contractor for provision of medical care at the detention center.

20. Defendant Turn Key is a private Oklahoma Limited Liability Company that is independently contracted by County to provide medical services at the OCDC.

21. Defendant Turn Key has been the contracted medical provider for OCDC since July 1, 2018.

22.   Defendant Turn Key engaged in the conduct complained under color of law and within the scope of its contract/ employment with Trust.

23.   In the alternative to the preceding paragraph, Defendant Turn Key acted in such a manner, or with such a mindset to equate to deliberate indifference, bad faith, malice, and/ or reckless disregard of the rights, health, and safety of Thomas, such that it was acting outside the scope of its employment/ contract.

24.   Defendant William Cooper was at all times relevant hereto the Medical Director for Turn Key and for OCDC.

25.   Defendant Cooper engaged in conduct complained under color of law and within the scope of his role with Turn Key and the OCDC.

26.   Defendant Cooper was, at times relevant hereto, responsible for creating, updating, reviewing, and revising the policies and procedures for the provision of medical services inside the OCDC.

## COMPLIANCE WITH THE OKLAHOMA GOVERNMENTAL TORT CLAIMS ACT, 51 O.S. §§ 151, *et seq.*

27.   Plaintiff timely complied with all requirements and obligations pursuant to the Oklahoma Governmental Tort Claims Act before the filing of this lawsuit.

28.   The required notice of Plaintiff's tort claim was sent to the City of Del City, Oklahoma County Criminal Justice Authority, Del City Police Department, and Turn Key Health Clinics, LLC, via Certified Mail on February 12, 2024, and received on February 16, 2024.

29.   Plaintiff's tort claim was deemed denied on May 17, 2024.

## FACTUAL BACKGROUND

### *Detention of Thomas*

30.   On or about March 31, 2023, Plaintiff was taken into custody by the Del City Police Department, following which he was transferred to the Oklahoma County Detention Center.

31.   Plaintiff Thomas Hawley suffers from severe cognitive and psychiatric impairments, including Autism Spectrum Disorder, bipolar disorder, epilepsy, and generalized anxiety disorder, all of which significantly limit his ability to function independently.

32.   Plaintiff's intellectual and adaptive abilities are commensurate with a child of 7-8 years old. Due to his conditions, he has a legal guardian, Stefnie Smith-Hawley, who oversees his well-being and is deeply familiar with his psychological and physical needs.

33.   Thomas's intellectual and mental health limitations make him highly vulnerable to abuse and exploitation, necessitating a secure, protective environment with consistent supervision to prevent harm.

34.   At the time of his arrival at the OCDC, Thomas had not been convicted of any crime.

35.   Upon Plaintiff's transfer, Stefnie Smith-Hawley informed both Del City Police officers and detention center personnel of Plaintiff's cognitive and psychiatric disabilities, explicitly warning them of his susceptibility to harm and his need for specialized monitoring.

36.   Defendant Turn Key Health Clinics, LLC, performed a medical intake screening and were made aware that Thomas was autistic and that his mother wished to bring his medication.

37. The medical intake showed that Defendant Turn Key was aware of Thomas's prior mental health problems, depression, epilepsy, and the fact that he is autistic.

38. Based on OAC 310:670-5-8(2), Thomas was required to be under frequent observation the entire time he was present in the OCDC.

39. Despite this requirement, the Jailer Defendants did not "frequently observe" Thomas during his detention through either sight checks or monitoring the 24-hour surveillance in his cell.

40. Even without the special status requiring "frequent observation", Thomas was still to be checked on with at least an hourly sight check, as well as a sight check as a part of the inmate count at the beginning of each detention officer shift.

41. Despite this notification and requirement, Plaintiff was assigned to a shared holding cell with David Lamb, a detainee with a history of violent or aggressive behavior.

42. On April 1, 2023, while in the shared holding cell, Plaintiff was subjected to sexual assault by David Lamb.

43. During the incident, Plaintfif verbally and physically indicated distress. The absence of adequate supervision or intervention allowed Lamb to proceed with the assault, resulting in severe physical and psychological trauma for Plaintiff.

44. Following the assault, Plaintiff exhibited acute psychogloical symptoms, including heightened anxiety, withdrawal, and signs of trauma. Despite visible signs of distress and his documented mental health needs, the detention center staff did not provide timely or adequate medical or psychological evaluation and treatment.

45.    David Lamb's actions were part of a common pattern and practice of sexually and physically assaulting fellow inmates whom he identified as vulnerable to his sexual abuse.

46.    Defendant employees of Del City Police Department, the OCDC, and/or Turn Key Health knew Lamb to be the "jailhouse rapist".

47.    Despite knowledge of Lamb's propensity for sexual violence and Hawley's cognitive and psychiatric disabilities, Defendant OCDC, and/or Turn Key Health chose to place Hawley in a cell alone with Lamb, and then leave Hawley Hawley unmonitored which allowed Lamb to commit a horrific sexual assault on Hawley.

48.    Defendants, acting under the color of state law, deprived Plaintiff of his constitutional rights to liberty and bodily integrity.

49.    Defendants should have been monitoring Lamb's conduct and had knowledge of his activities because inmates had accused or reported that Lamb was using or participating in sexual harassment, misconduct, and/or assaults against fellow inmates before Lamb's attack on Plaintiff.

50.    Defendants both could have and should have prevented Lamb's attack upon Plaintiff, but deliberately ignored, and displayed a pattern, practice, and custom of disregarding the previous credible complaints against inmates and detainees, like Lamb as discussed above, as well as the available systems, databases, records, information, and evidence readily available to Defendants.

51.    Despite their knowledge of Lamb's sexual harassment, misconduct, and/or assaults on other inmates prior to his attack on Plaintiff, Defendants permitted Lamb to be locked in the same holding cell as Plaintiff.

52. Lamb should have been placed in a separate holding cell as a result of his previous conduct as Defendants had knowledge of prior reports to OCDC that Lamb was using or participating in sexual harassment, misconduct, and/ or assaults against fellow inmates before Lamb's attack on Plaintiff.

53. By virtue of the credible complaints the Detention Officers and the Trust received from prior victims of Lamb's sexual harassment, misconduct, and/or assaults, the Detention Officers and the Trust should have either separated Lamb from other inmates, or, at the very least, monitored his actions. The Detention Officers and the Trust knew or had reason to know of the dangerous activities of Lamb prior to the time of Lamb's sexual assault of Plaintiff.

54. With knowledge of the complaints against Lamb, the Trust, the Detention Officers, and Trust Administrator Garner, failed to open any investigation into those complaints or take and other action to supervise, control, and/or discipline Lamb, before it was too late.

55. With knowledge of complaints of sexual misconduct against Lamb, and prior to the assault on Plaintiff, both the Trust and Administrator Garner failed to adequately train detention officers to take such complaints seriously, conduct proper investigations, control and supervise inmates accused of sexual misconduct, and discipline those inmates appropriately.

56. Each of these failures by The Trust, Administrator, and the OCDC staff to supervise and/ or train were done with:

   a. Full knowledge of the widespread occurrence of inmate sexual misconduct;

b. Full knowledge of the likely scenario of receiving complaints of sexual misconduct by an inmate;

c. Full knowledge of the need for – and the reasoning behind – training detention officers within the OCDC to investigate and prevent complaints of sexual misconduct of an inmate;

d. Full knowledge of the need for – and the reasoning behind – training supervisory officers within the OCDC to take additional steps to supervise, control, train, and/ or discipline inmates who have been accused of sexual misconduct against other inmates;

e. Full knowledge specifically of the absence of training for supervisory detention officers within the OCDC to investigate complaints of sexual misconduct against an inmate;

f. Full knowledge specifically of the absence of training for supervisory detention officers within the OCDC to take additional steps to supervise, control, and/ or discipline inmates who have been accused of sexual misconduct by other inmates;

g. Full knowledge of the likelihood that an inmate committing sexual misconduct against a fellow inmate would continue to commit such acts absent the investigation of credible complaints, supervision, and/ or discipline;

h. Full knowledge of the complaints made against Lamb specifically;

i. Full knowledge specifically of the likelihood that Lamb would continue his sexual misconduct absent the investigation of credible complaints, supervision, and/ or discipline; and

    j.  Full knowledge specifically of the failure of supervisory detention officers within the OCDC to take any action whatsoever to investigate the complaints against Lamb, to supervise Lamb, and/ or discipline Lamb.

57.    The failures to monitor by the Trust, the Detention Officers, and Trust Administrator Garner, with the knowledge of each item set out above, constitutes deliberate indifference to the likely continuation of sexual misconduct by inmates in the OCDC.

58.    The failures by the Trust, the Detention Officers, and Trust Administrator Garner to investigate credible complaints of sexual misconduct against Lamb and other inmates, and their failure to supervise, discipline, and control these individuals to prevent further instances of sexual misconduct, were carried out with:

    a.  Full knowledge of the likelihood that an inmate committing sexual misconduct against another inmate would continue to commit such acts absent the investigation of credible complaints, supervision, and/or discipline;

    b.  Full knowledge of the complaints made against Lamb specifically; and

    c.  Full knowledge specifically of the likelihood that Lamb would continue his sexual misconduct absent the investigation of credible complaints, supervision, and/or discipline of Lamb.

59.    The failure to monitor Lamb by the Trust, the Detention Officers, and Trust Administrator Garner, with the knowledge of each of the items set out above, constitutes deliberate indifference to the likely continuation of sexual misconduct by Lamb against fellow inmates.

60. Defendants the Trust, the Detention Officers, and Trust Administrator Garner, by demonstrating deliberate indifference to (1) complaints of sexual harassment, misconduct, and/ or assault by inmates; (2) the need to train detention officers to properly handle and investigate such complaints; and (3) the need to supervise and/ or discipline Lamb, coupled with their display of a pattern, practice, and custom of ignoring dangers posed by Lamb after receiving information which would alert them to said dangers, permitted Lamb to continue to assault fellow inmates. As a result, they are legally liable to Plaintiff for the damages, injuries, and losses he has sustained and will continue to sustain in the future.

61. Defendants the Trust, the Detention Officers, and Trust Administrator Garner are liable for Lamb's actions due to their deliberate indifference to the known threat he posed. Their failure to address this threat created a hostile and dangerous environment for inmates at the OCDC, including Plaintiff.

62. Defendants the Trust, the Detention Officers, and Trust Administrator Garner are liable for Lamb's actions due to their deliberate indifference to the known threats created by the policy of ignoring and/or not investigating credible complaints of an inmate's sexual harassment, misconduct, and/or assault, and by their decision not to train detention officers on how to handle and investigate such complaints, inclusive of supervising and/or disciplining inmates who are subject of such complaints.

63. In doing the acts and/or failing to act as described herein, Defendants Detention Officers were acting on the implied permission and/or consent of both the OCDC and the Trust.

64. As the direct consequence of their own actions, Defendants the Trust, the Detention Officers, and Trust Administrator Garner damaged the Plaintiff by causing him to suffer extreme physical, mental, and emotional distress, violated his constitutional rights, and infringed upon his interest in personal safety and security.

### *Ongoing Problems, Policies, Procedures, and Customs of*
### *the OCDC*

65. Prior to the formation of Trust, the problems at the OCDC were long known.

66. Since its construction in 1991, the OCDC has been riddled with difficulties. Many of those issues, including but not limited to overcrowding, understaffing, inadequate security and supervision, and inadequate access to medical care, continue to threaten the health and well-being of inmates confined there today.

67. The unconstitutional conditions at the OCDC are so well-known and publicized that none of Defendants Board, Trust, Administrator, Turn Key, or Cooper could, with a straight face, deny actual awareness.

68. At least eight (8) highly credible groups or individuals have studied and documented problems and necessary reforms to bring the OCDC into constitutional compliance:

    a. Oklahoma County Grand Jury Report (1995)[1];

    b. Primary 9 Jail Committee, (2002);

---

[1] On March 27, 1995, a Grand Jury was formed to investigate the ongoing problems within the OCDC. On October 27, 1995, the Grand Jury issued its Partial Report and noted that leaving pods unsupervised, a practice that continues even today, "should terminate immediately." Oklahoma County has **not** followed these recommendations.

    c.   Jail Funding Task Force (2003-07)[2];

    d.   Department of Justice, (Ongoing);

    e.   Adult Detention Advisory Committee Report;

    f.   Consultant Dave Parker;

    g.   Oklahoma Multicounty Grand Jury Report (2023); and

    h.   National Institute of Corrections, Technical Assistance Report, 2021.

69.    On July 31, 2008, the United States Department of Justice, Civil Rights Division (DOJ), concluded a more than five (5) year investigation into the OCDC to "ensure that conditions at the Jail meet federal constitutional requirements." (U.S. DOJ, Re: Investigation of the OCDC and Jail Annex, Oklahoma City, Oklahoma, July 31, 2008, p. 1)(hereinafter "DOJ Report").

70.    The report summarized the conclusions of the DOJ as follows:

> Having completed the fact-finding portion of our investigation, we conclude that certain conditions at the Jail violate the constitutional rights of detainees confined there. As detailed below, we find that the Jail fails to provide for detainees': (1) reasonable protection from harm; (2) constitutionally required mental health services; (3) adequate housing, sanitation and environmental protections; and (4) protection from serious fire-safety risks.

(DOJ Report, p. 2).

71.    As used in the DOJ Report, the term "detainees" includes both pre-trial detainees and

---

[2] In the wake of the defeat of the 2003 ballot measure for a new jail, the County formed a Jail Funding Task Force to propose solutions to the Jail funding problems. On March 30, 2007, the Jail Funding Task Force received a report from Bill Gamos, then of The Facility Group. The Board members were given a survey regarding opinions for renovation and expansion of the Jail. Chairman Vaughn collected the surveys and prepared a report of the results. The survey results indicated that those responding were in favor of adopting "all or part" of Gamos' recommendations. Oklahoma County has not followed those recommendations.

post-adjudication inmates. (See, DOJ Report, Fn. 2).

72.    The DOJ Report analyzed conditions at the OCDC in light of Fourteenth and Eighth Amendment standards. (DOJ Report, p. 3).

73.    Furthermore, in their preparations to assume control and administrative responsibilities for the OCDC, Defendants Trust and Administrator received and reviewed a copy of the DOJ Report by at least July of 2020.

74.    Further, Defendants Turn Key and Cooper, in their role providing medical services at the OCDC, received and reviewed a copy of the DOJ Report by at least July of 2020.

75.    OCDC entered into a memorandum of understanding with the Department of Justice in 2009, that required the County to adequately fund and staff the jail by 2014, or face court action from the federal government to force compliance. As of August 2021, County had not complied with the requirements of its memorandum of understanding with the Department of Justice.

76.    From 2009 to February 2021, there have been at least eighty-four (84) deaths at the OCDC. The average annual death rate was 3.3 per 1,000 inmates, more than double the national average.

77.    From 2016 through 2019, the OCDC had 40 deaths and an average annual mortality rate of 4.77 deaths per 1,000 inmates. The national average is 1.46 deaths per 1,000 inmates.

78.    In 2016, the DOJ threatened to file litigation against County regarding the ongoing unsafe conditions at the OCDC. These unresolved conditions, along with the longstanding, well-known lack of staffing and supervision at the OCDC, caused the denial of proper medical

and psychiatric care to Thomas.

79.   County policy makers and elected officials have known about the unconstitutional conditions at the OCDC that caused injuries to Thomas for over twenty years.

80.   The Adult Detention Advisory Committee ("ADAC"), which included some of the most respected members of the community, prepared a report pointedly stating that:

> [A]ll these [above] groups have recommended that the County take action. Unfortunately, the County has chosen to take no substantive action. Perhaps that is a result of a lack of resources or a lack of political will. The Committee believes neither is an acceptable explanation. These issues have been studied over and over again, yet 13 years after the Grand Jury report the County has taken no action on any of these groups' recommendations. Lack of money is no excuse for continued violation of detainees' Constitutional rights. . . .

81.   In its conclusion, the ADAC was frank about the relationship between the OCDC and County policymakers in recognizing that, "we ought to be ashamed of ourselves", and Oklahoma "County has received it's warning."

82.   County has failed to respond, time and again, as this tortured commentary on the state of affairs at the OCDC remains true today. And, in Thomas Hawley's case, the failure to respond resulted in severe and preventable injuries.

83.   In February 2019, Oklahoma County Special Judge Geary Walke stated that, Oklahoma County's mental health court will no longer keep its participants awaiting treatment in the custody of the jail. Instead, they will be released on their own recognizance.

84.   Judge Walke is quoted as saying: "Unfortunately, our jail is not the sort of place that we can consider a safe place for our people."

85.   The Federal Bureau of Prisons removed all federal detainees from the OCDC in 2008 because of the dangers posed by the conditions at OCDC.

86.    Numerous news and internet articles also made Defendants County, Trust and Administrator aware, prior to July 2020, of the unreasonable conditions at the OCDC. For example: "Over the past 15 years, the 13-story jail, in Oklahoma City has had many alleged problems, from unsanitary conditions to negligent care of inmates, poor medical care, and outright abuse of inmates. A clerical worker at the jail posted a YouTube video claiming inmates had been beaten right in front of her." (Business Insider, The stories coming out of this Oklahoma jail are horrifying, February 25, 2015).

87.    The Annual Adopted Budget, Oklahoma County, Oklahoma, Fiscal Year 2016-2017, reveals hundreds of thousands of dollars diverted away from adequately funding the OCDC in favor of purchasing various non-essential items, including **$62,245** for "Culture and Recreation," **$35,550** in "membership fees," **$150,000** in "outside legal fees," **$69,888** in travel for the Sheriff's department, **$5,200** in travel for commissioner Johnson, **$6,500** in travel for commissioner Maughan, and **$7,422** in travel for commissioner Vaughn.

88.    The **$336,805-plus** spent in violation of the County's constitutional obligation would cover annual maintenance costs for the OCDC video surveillance system.

89.    Audits have also determined that the Sheriff's office failed to fund jail operations in favor of spending on vehicles.

90.    Among the "key findings" in the 2016 Investigative Audit of the Sheriff's Office was the discovery of "[a]pproximately $900,000 [] spent on the purchase of Sheriff vehicles during a time when other obligations of the Sheriff's Office were not being met."

91.    The decision by these policymakers to fund luxuries before correcting constitutional

deficiencies reflects a well-entrenched indifference to the ongoing conditions at the OCDC, and is continued to this day by Oklahoma County, even after the operation of the OCDC has been transferred to Defendant Trust.

92. Either the County failed to adequately fund the Sheriff's office to fulfill its constitutional duty to provide a facility that was adequate for the safekeeping of inmates, or Sheriff's office squandered taxpayer money on luxuries instead of correcting the deficiencies that have existed for more than 20 years.

93. Defendant Trust has continued this policy and practice of underfunding the OCDC and continue to maintain its known inadequate and dangerous practices and conditions.

94. In the alternative to the preceding paragraph, Oklahoma County has continued this practice by underfunding Trust which in turn causes underfunding of the OCDC and causes the continuation of known inadequate and dangerous practices and conditions.

95. Upon information and belief, County, Trust, and Administrator reviewed and knew about each of these findings and conclusions by at least July of 2020.

96. Despite being aware of the unconstitutional conditions at the OCDC and a pattern and practice of failing to provide adequate medical and mental health care, Defendants County, Trust, and Administrator deliberately disregarded the substantial risk of serious harm that existed prior to and on or about April 1, 2023, to detainees/inmates, including Thomas, as a result of the unconstitutional conditions at the OCDC.

97. Despite notice and opportunity to correct these deficiencies, and despite assurances that deficiencies would be corrected, Defendants County, Trust, and Administrator continued to understaff and underfund the jail, resulting in the failure to supervise

inmates and to provide timely access to medical and mental health care, and continuing the known risk of harm to inmates posed by those conditions.

OSDH Notice of Deficiencies 2019

98.   In August of 2019, the OCDC was provided notice that an inspection had been performed earlier in 2019, by the OSDH and that the jail was found to be out of compliance with multiple requirements of the Oklahoma Jail Standards.

99.   The OSDH found that, in regard to the investigation into the then-recent death of an inmate, required hourly sight checks had repeatedly not been performed, with one staff member even admitting to falsifying the sight check logs to hide the fact that the checks had not been done as required.

100.   In response to this notice of violation, then-Sheriff Taylor and the OCDC responded that:

a.   All incidents of staff not completing sight checks were being handled through disciplinary process;

b.   A new procedure has been implemented for staff to contact the Camera Ops post during sight checks to ensure accountability;

c.   The OCDC's sight check policy was reviewed annually and training on sight checks takes place during pre-service training and during annual in-service training.

OSDH Notice of Deficiencies April 2020

101.   On April 6, 2020, the OCDC was again notified that it was found to be out of compliance with the Oklahoma Jail Standards.

102.   The OSDH found that the OCDC had failed to report a serious suicide attempt resulting

in death to the OSDH as required by the Oklahoma Jail Standards.

103.    The OSDH further found that the OCDC failed to have working intercom systems in several cells on multiple floors. These intercom systems are required so that an inmate may request emergency assistance if needed.

104.    In response to these noted deficiencies, then-Sheriff Taylor and the OCDC responded that:

    a.  The policy regarding maintenance and operation of the intercom systems were available for staff unrestricted;

    b.  Staff are instructed to complete a work order and move inmates to cells with working phones/intercoms, if a cell is found to have a system that is not working.

105.    Trust was made aware of these violations prior to assuming control of the OCDC in July 2020, via being provided copies of the communications and documentation from both the OSDH and the OCDC's responses.

Trust Assumes Control - July 2020

106.    On July 1, 2020, Trust officially took over control of the OCDC and appointed Administrator to oversee the operations of the OCDC.

February 4-5, 2021, OSDH Inspection:

107.    During an unannounced inspection of the OCDC on February 4-5, 2021, the OSDH found that the OCDC still regularly failed to perform and document sight checks of inmates in multiple units throughout the jail, including frequent sight checks for inmates on mental health observation status, in the medical unit, on suicide watch or who were juveniles during the period from May 23, 2020, through February 5, 2021, sometimes

including entire days with no checks.

108.    The OSDH also found that the windows of cells on the 2nd, 4th, 6th, 8th, 10th, 12th, and 13th floors were obscured from scratches on the surface of the window, allowing for 50% visibility, making it impossible to have "clear visibility within close proximity" as required for properly performed sight checks.

109.    Further, the OSDH found a history of the OCDC hiding serious inmate incidents from the OSDH, including:

    a.   On July 23, 2020, the Jail failed to notify the OSDH about an inmate requiring transfer to an outside medical facility;

    b.   During the calendar year 2021, the OCDC failed to notify the OSDH regarding forty (40) serious injuries of inmates requiring transfer to an outside medical facility.

110.    The OSDH also found, through numerous interviews with inmates housed in various units, that their phone calls for assistance often went unanswered and ignored.

111.    The OSDH found that the OCDC staff was so undertrained for their jobs, that many did not know where the intercom Duress/Emergency calls even went to, with many staff members saying it rings to the medical unit while jail administration, including Administrator, stated those calls go to "Camera Ops" – the 24-hour video surveillance station.

112.    The OSDH even found, through interviews with staff, that some phone systems did not even work.

113.    The OSDH also found that the OCDC was inadequately staffed such that it resulted in missed sight checks due to jailers performing such tasks as clinical escort, feeding other

units, assisting in counts, and escort of medical staff.

114.    The OSDH found, through interviews with jailers, that having to perform multiple duties in several units on a floor caused lapses in inmate supervision and required sight checks.

115.    These findings were presented to Administrator, Trust, and County on March 30, 2021.

Response to March 30, 2021 Statement of Deficiencies

116.    In response to the March 30, 2021, letter setting out the deficiencies pertaining to sight checks at the OCDC, Administrator responded identifying the corrective actions Administrator, County, and Trust would be taking to rectify those deficiencies, stating:

   a.    That since the inspection date, February 4, 2021, Shift Supervisors have been reviewing the sight check policy and requirements during the shift briefing;

   b.    The Shift Supervisor and Captains conduct daily review of the logbooks for sight checks being completed;

   c.    That officers have been told to notify their supervisor if a sight check cannot be performed due to another required job task and have been told to submit an incident report explaining why the sight check was missed;

   d.    That Shift Supervisors will make every effort to assign another officer to perform the sight check;

   e.    That the full definition of sight check has been reinforced with staff as described in OCDC policy;

   f.    That the OCDC had obtained and had begun replacing the scratched cell windows obscuring offers clear visibility during sight checks.

117.    In response to the March 30, 2021, letter setting out the deficiencies pertaining to the

OCDC's cover-ups and/or failures to report serious injuries to inmates requiring transfer to an outside medical facility, Administrator responded identifying the corrective actions Administrator, County, and Trust would be taking to rectify those deficiencies, stating that the OCDC's investigations division and/or Chief of Security Captain have been assigned to report all serious injuries requiring transfer to an outside medical facility to the OSDH no later than one working day per this standard, via emailing the Detention Facility Incident Report to the OSDH.

118. In response to the March 30, 2021, letter setting out the deficiencies pertaining to 24-hour inmate supervision at the OCDC, Administrator responded identifying the corrective actions Administrator, County, and Trust would be taking to rectify those deficiencies, stating:

   a. All inmate Duress/Emergency calls are answered at the Camera Ops post;

   b. Camera Ops staff will notify the officer assigned to the floor and pod of an answered call for an immediate response;

   c. That staff are purportedly informed of this during new hire training, daily briefings, and informed by shift supervisors and administration.

119. In response to the March 30, 2021, letter setting out the deficiencies pertaining to observation of inmates who present a medical or psychiatric risk, Administrator responded identifying the corrective actions Administrator, County, and Trust would be taking to rectify those deficiencies, stating:

   a. All staff are purportedly trained on this policy during cadet training and have access to the policy;

b. Sight checks are conducted according to the inmate's classification and assigned floor/cell assignment;

c. Sight checks are conducted by the assigned staff and shift supervisors;

d. Sight checks are documented in logbooks and/or sight check observation sheets/form if applicable;

e. That since the inspection date, February 4, 2021, Shift Supervisors have been reviewing the sight check policy and requirements during the shift briefing;

f. The Shift Supervisor and Captains conduct daily review of the logbooks for sight checks being completed;

g. That officers have been told to notify their supervisor if a sight check cannot be performed due to another required job task and have been told to submit an incident report explaining why the sight check was missed;

h. That Shift Supervisors will make every effort to assign another officer to perform the sight check;

i. That the full definition of sight check has been reinforced with staff as described in jail policy;

j. That the jail had obtained and had begun replacing the scratched cell windows obscuring offers clear visibility during sight checks.

120. Trust and County were aware of these notices of violations as a part of their oversight role pertaining to the OCDC and were sent a copy of the report outlining the violations found at the OCDC.

Death of an inmate with mental health needs – April 13, 2021

24

121.    On April 13, 2021, an inmate at the OCDC, Christa Sullivan, died after being denied medical and psychiatric treatment that she had long been in need of and was well known to the OCDC and Defendant Turn Key.

122.    OCDC and Defendant Turn Key failed to provide her medical or psychiatric care, despite knowing of her obvious need for care.

123.    For months prior to her death, since November 2020, Ms. Sullivan's medical records showed that she received a medical referral for transfer due to "medical and psychiatric necessity," and that record also stated that she "is continuing to decline physically due to severe mental illness and has become unfit to continue at OCDC" and "is at extremely high risk for complications including sudden death."

124.    Ms. Sullivan's records documented that she weighed 142 pounds when she arrived at the facility on April 27, 2020, and that her weight significantly declined from that point, with weights of: 124 pounds on June 28, 2020, 121 pounds on October 30, 2020, 119 pounds on December 5, 2021, and 115 pounds on March 23, 2021.

125.    Ms. Sullivan's medical records from the OCDC and Defendant Turn Key further revealed that there was no documentation of any follow-up care to Ms. Sullivan related to her repeated referrals for outside medical and psychiatric care before her death on April 13, 2021.

126.    Defendants County, Trust, Administrator, Turn Key, and Cooper were all notified of this death and the findings of the subsequent investigation by the OSDH after the investigative report was delivered to the OCDC on July 12, 2021.

<u>May 2021 – Dave Parker Investigation</u>

127.    Defendants Trust and Administrator hired a consultant, Dave Parker, to come into the OCDC to evaluate their operations and provide feedback as to how operations could be improved at OCDC.

128.    During his visits to the jail in May 2021, Mr. Parker observed the following widespread problems within the jail:

   a.    When questioning staff, many did not even comprehend the OCDC's policies and when questioned how they learned their jobs, most indicated that they learned by word of mouth from coworkers – *not supervisors*. Most staff interviewed knew where to locate policy binders but had no idea if they were current. Some had even signed the document in the policy binder that they read and understood the policies while admitting that they were not confident in knowing or understanding the content.

   b.    Training curriculum in the jail was outdated, with a specific lack of training for dealing with inmates with mental health issues – like Thomas. Mr. Parker further criticized the jail's policy of using online training that has no way to measure staff understanding and comprehension of the material. Further, Parker found that little to no in-service training was performed by supervisors.

   c.    There was a complete failure of assigning job duties and roles within the jail, and a complete lack of supervision, to the extent that supervisors within the jail created and maintained their own "empires" wherein only certain tasks those jailers were assigned to perform would actually be performed, with no continuity or consistency in the way things were done across the jail, causing multiple units to perform some tasks but not other required tasks and that such tasks were performed wholly differently within each

"empire." Parker went so far as to suggest that, as of May 2021, likely all jail incidents in the preceding 12 months could have been prevented if everyone in the jail had the same training.

d.  That inmates are often brought into the jail and bypass the Classification officer and process entirely, depriving them of the opportunity to be housed in the correct category of cell, which could include heightened medical observation or mental health needs. Parker even found that employees had little understanding of the classification process and could not explain why things were done the way they were.

e.  The jail often relies on staff not trained as detention officers to perform inmate supervision roles, such as monitoring cameras of dayrooms. Parker criticized this practice because those non-detention officer staff members do not have the capabilities to respond to an emergency if one is observed – other than calling someone who might be on another floor to come and respond.

f.  Parker directly challenged and disputed the narrative that the jail's issues arise from understaffing, and instead placed the blame on mismanagement, poor facilities, and widespread lack of training and supervision of staff at multiple levels.

g.  Parker found officers and their supervisors were making medical decisions – not medical staff.

h.  Parker repeatedly observed jail employees engaged in other activities that divert their attention away from their jobs, such as cellphones, books, puzzles, and artwork.

i.  That sight checks were not taking place consistently and that jailers were relying on a "wand" which they insert in a hole for the wand to read how many people are in a cell

without ever actually looking in the cell to ensure inmates are safe and not in need of emergency attention.

129.   Parker also observed an inmate brought into the jail and going through the classification process. Parker saw the inmate arrive at intake at 9:50 a.m. on May 4th. The booking officers could not locate a record for the inmate, so he was moved to a bench in that area. Parker saw no further action taken. On May 6th, Parker returned and followed up on that inmate with the Classification officer on duty. That officer could not produce a current record regarding the intake and classification of the inmate. Parker found the inmate in a cell and found out that he had only arrived in a cell that very morning.

130.   Parker's reported these problems and his recommended fixes to Administrator and Trust well before Thomas' detention.

Evaluation by the National Institute of Corrections:

131.   From May 18-21, 2021, advisors from the National Institute of Corrections ("NIC") evaluated the operations of the OCDC.

132.   The Technical Report from the NIC highlighted the following:

   a.   that the design of the OCDC is outdated, using an indirect inmate supervision construction model while the modern standard is jails built on a direct inmate supervision model.

   b.   that nearly a year into Trust's control of the OCDC, and almost two years since it began its operational planning, the annual budget for the OCDC was still unclear and inadequate for the operation of the OCDC, including needed facility improvements, equipment repairs, and staffing.

c.  As of May 18-21, 2021, the staffing plan for OCDC was still wholly incomplete with target staff numbers ranging from 350 to 560 and with a loss of 300 staff members in the 11 months prior to May 18-21, 2021.

d.  inmates were observed using fires in small cans to cook their food because of a lack of hot water in their cells.

e.  Additionally, smoke detectors in the building were not working.

f.  A test of the intercom/phone system for inmates to request emergency assistance found two numbers provided to inmates did not work, and a third rang to Central Control with no answer. Inmates informed the advisors that they would have to beat on their cell doors to get help.

g.  Most of the staff interviewed during this time did not know the number inmates were to dial for emergency assistance and had never tested it in their housing units.

h.  OCDC had a contract with Global Tel*Link Corporation at that time which calls for repairs to phones/intercoms to be made within 1-6 hours or face a $1000/day penalty up to $35,000.00 annually, yet no repairs had been made, even since the OCDC, Trust, and Administrator knew of the high number of non-working phones/intercoms and knew they were relied on for inmates to access emergency medical care.

i.  no signs were posted to advise inmates of the number to call for emergency assistance, despite the fact that Administrator and Trust knew inmates had been given incorrect numbers or no information as to what number to call for emergency assistance.

j.  Inmates were found to be sleeping three to a cell due to holes between cells, with one inmate sleeping on a mattress on the floor due to persistent bedbug issues.

k.  Staffing levels were found to be insufficient for a safe and secure jail.

l.  In order to recruit staff, the OCDC was found to have been cutting corners and reducing requirements for employment, including "same day applicant" hiring without thorough background checks.

m.  The OCDC was only offering a two-week "academy" for training with no Jail Training Officer programs.

n.  The operational staff expressed to the advisors that the new personnel in the OCDC lacked the basic skills to be detention officers.

o.  The OCDC inmate classification system was found to be technologically outdated and with staff needing updated policies, procedures, and training.

p.  Further, the intake and classification process was outdated and operating under a method that has been invalidated by court decisions.

q.  The Intake and Release area was found to be far too small for handling the 80-100 arrestees per day that come into the jail, causing the area to be cluttered, in disarray and causing processing issues. The area also had water leaking from the ceiling with ceiling tiles hanging down.

r.  the medical screening and intake process was severely lacking and failing at preventing arrestees who are too ill or injured to be incarcerated from being admitted instead when they should be taken to a hospital, with no way for arresting/transporting officers to document any medical concerns or information.

s.  All of the housing units visited by NIC advisors were in poor condition with cracked windows, disabled phones, and broken tables, chairs, and kiosks. Water stains from

leaks were visible everywhere, and some ceilings were corrupted, hanging down, and stained.

t.  Holes were found in the cell walls large enough for inmates to move from cell to cell in a line inside their housing pods.

u.  the Pod Control Booths were in disarray, not clean, and full of old used equipment and documents. Further, no OCDC policies, procedures or Post orders were anywhere to be found.

v.  The advisors found no padded cell in the facility for use with severely mentally ill inmates and those inmates who are a danger to themselves and others.

w.  A juvenile cell inspected, with an inmate in it, was filthy, with the toilet and sink backed up with water and a phone system that only worked intermittently. Further, the juvenile inmate was housed too close to adult inmates in violation of legal requirements.

x.  In the medical unit, medical staff and detention staff who had been on their assignments for over a year, had no clue what was in a locked cabinet in their office. It took several hours for them to find out who had a key and found that it was full of lice control supplies.

y.  the NIC advisors found a massive lack of policies, procedures, and post orders throughout the facility, leaving staff uninformed as to their responsibilities and how to perform their jobs. Ultimately, new policies, procedures, and post orders were found in the Quality Control office, ready to be used but not disseminated because, as advisors were told that "no one had asked for them." The advisors found this type

of miscommunication prevalent amongst staff throughout much of the facility's operations and was disturbing to the advisors.

z.  Turn Key had no manual available for their staff to follow, and had only a few operational protocols.

aa. Turn Key staff interviewed by the advisors stated that they received no training for the correctional environment, but that it was simply expected they would know how to operate in the correctional environment when they were hired.

bb. at that time, Turn Key was behind on performing health assessments of inmates by 300 inmates.

cc. Turn Key staff also expressed significant concerns that they were no able to receive communication from the inmate population pertaining to medical needs as easily as they should.

dd. Turn Key had asked the OCDC for training for its employees for Prison Rape Elimination Act duties and requirements and for Crisis Intervention, generally pertaining to mentally or emotionally disturbed inmates. The OCDC had provided no such training.

ee. lower-level Turn Key medical staff had been prescribing special diets for inmates claiming a "bean allergy" which the Director of Nursing did not know about and admitted that, in fact, there is no such nationally recognized allergy. Instead, medical staff were so undertrained and without guidance or policies, procedures, or protocols in how to do their jobs that they were being taken advantage of by inmates who simply wanted a different meal than the general population.

ff. Turn Key's director of nursing at the OCDC specifically expressed concerns that operational/detention staff did not have Crisis Intervention training for handling mentally and/or emotionally disturbed inmates.

gg. The lack of proper staffing levels in the OCDC was found to have led to quick hiring of unqualified people without background checks for detention officer positions, inclusive of gang members.

hh. the background investigation unit, who is responsible for background checks of potential new hires, was doing less than the minimum. The advisors found that poor administration and mismanagement were causing problems as there was a complete operational and communications breakdown between the Director of HR and the background investigations unit surrounding these hiring issues.

ii. When it came to training of new hires, the advisors found the training curriculum in the OCDC's "Academy" was insufficient to train qualified detention officers. The Chief Financial Officer for the OCDC blamed the short training as due to a lack of funding for a longer course.

jj. In meeting with the Director of Training, the advisors found several problems with the OCDC training program, including a lack of space for training, need for leadership training, outdated curriculum in need of updates – especially for "in-service" training, shortness of the Jail Academy and Annual training, and the lack of a Jail Training Officer program for on-the-job training of new hires after the Academy.

kk. the NIC advisors found no true inmate management. The advisors found it beyond comprehension that the OCDC still purportedly operated with a single detention

officer assigned to a Pod Control Booth, who makes hourly rounds of looking into cells with no coverage of that position – or anyone monitoring the inmates – overnight. The advisors found that this lack of overnight supervision, paired with the fact that the emergency phone system is inoperable, places inmate safety in constant jeopardy.

ll.  the sight check frequency used in the OCDC to be outdated and below the national standards, such as those set by the American Correctional Association.

mm.

133.   The advisors attributed some of these problems to the OCDC's reliance on the outdated "indirect supervision" model of operation and encourage the OCDC to move to a "direct supervision model." The advisors specifically recommended to the OCDC that, until the OCDC can move to a "direct supervision" model, they should have constantly moving teams of at least two detention officers entering pods and observing inmates in and out of cells, especially at night.

134.   The NIC advisors informed OCDC, Administrator, and Trust that failing to adopt an Objective Classification System and using the process they currently had in place was a danger to operations of the OCDC in general, would foreseeably result in litigation, and a danger to inmate and staff safety.

135.   The advisors provided Administrator with copies of NIC's Objective Jail Classification for Jail Administrators, and offered assistance from the NIC for implementation of such a system.

136.   At the time of Thomas' detention, the OCDC, Administrator, and Trust had taken no

steps to implement such a system and had not accepted any assistance from the NIC.

137.    The OCDC was in the process of formulating a Policy Statement regarding Classification at the time of the NIC evaluation, but it was not yet in practice.

138.    At the time of Thomas' detention, the OCDC, Administrator, and Trust had taken no steps to implement that Policy Statement.

139.    The NIC advisors reported to Administrator, the OCDC, and Trust that holes in cell walls showed failures of the jail's architectural design of indirect inmate supervision and its poor construction.

140.    The NIC advisors recommended that, if county funding were unavailable, proceeds from the Inmate Commissary funds might be used to repair the OCDC, specifically damaged cells and housing units.

141.    The NIC recommended that old Post Orders be placed in the housing pods to provide guidance for detention officers until the Post Orders are updated to reflect new policies, practices, and standards.

142.    At the time of Thomas' detention, no Post Orders, policies, or procedures were ever placed in the pods, leaving undertrained detention staff with no clear guidance how to perform their jobs and supervise inmates.

143.    The NIC advisors recommended that the OCDC administration have personal meetings on all shifts regarding goals, objectives, and expectations of detention officers' jobs.

144.    The advisors indicated to Trust and Administrator, in their report, that the failure to properly train detention officers at the outset greatly contributes to the high detention officer attrition rate.

145.    The advisors found a worrying breakdown throughout the culture of the OCDC. Specifically, they highlighted the fact that the Director of Training had never even spoken to jail managers to determine what the training needs are, among other problems. The advisors found these "agency culture" problems were due in large part to a lack of involvement of Administrator and the Chief of Operations for the OCDC.

146.    One lieutenant, directly involved in the training of new hires, told the advisors that new detention officers were not receiving enough training prior to their placement in the facility. She further expressed that new hires, volunteers, contractors, and service providers were not receiving Prison Rape Elimination Act training.

147.    Further, the lieutenant explained there is no in the field training program, but rather new hires who completed the academy were assigned to shifts and given hands-on experience by performing the duties – in other words, these new detention officers were placed on duty in the jail with no hands-on training and no training officer to shadow them, evaluate them, correct them, or teach them.

148.    The same lieutenant expressed that there was a serious lack of policies and procedures or operational guidance available to jail and that this problem had been ongoing. She expressed concern that changes have occurred to the operations of the OCDC that were not covered in any policies.

149.    Interviews with Captains in the OCDC, including Tiffany Carter, also revealed that many detention officers were being placed directly into the jail with no training on the same day they were interviewed for the position. This even resulted in a known gang member from another county being placed in the jail as a detention officer and then removed once his

gang involvement was realized. Further, the Captains, including Tiffany Carter, expressed that many detention officers had little to no training in vital areas such as communication and de-escalation.

150.    The Captains, including Tiffany Carter, also expressed that the hiring, interview, and background process was very unorganized and unprofessional which resulted in poor quality hires and that a large problem for them was the lack of structured policy, procedures, and post orders.

151.    The NIC advisors found some outdated policies and post orders in the jail but noted that they were far from adequate.

152.    The Captains, including Tiffany Carter, expressed serious concern about an overall lax approach to safety and security.

153.    Jail staff expressed concerns that a majority of the administrative leadership work from home and are seldom at work even beyond COVID-19 reasons.

154.    Staff also expressed that the Director of Training was actually putting most of his focus on "hiring interviews" and spending little to no time teaching and training.

155.    The OCDC, Administrator, and Trust were made aware of all of these findings, problems, and recommendations well before Thomas' detention.

156.    None of the needed changes pertaining to inmate supervision, sight checks, provision of policies and procedures, staffing levels, insufficient training, dangerous hiring practices, were made prior to Thomas' detention. Further, the equipment problems identified, specifically the intercom/phone system used for inmates to request emergency assistance, were not repaired or resolved prior to Thomas' detention.

June 2021 OSDH Inspection Findings:

157.    The OSDH performed an unannounced inspection of the OCDC in June, 2021 and found the jail in violation of requirements pertaining to inmates with behavioral/mental health issues.

158.    The OCDC – and Defendant Turn Key – were required to include items such as behavioral observation, including state of mind and mental status, in an inmate's medical reception information. The OSDH found that on June 24, 2021, the OCDC had failed to perform any medical or mental health intake of at least one inmate and that the same inmate was involved in a use of force incident in the booking area on June 24, 2021, but no detention staff nor medical staff performed any medical intake or immediate physical screening of that inmate after the use of force.

159.    The OSDH also found that the OCDC repeatedly failed to perform required inmate counts at each shift change on June 17th, 18th, 19th, 20th, 21st, 22nd, and 23rd of 2021. The counts were not performed during the shift changes at three separate times on those days. During the period from June 17-June 23, 2021, OCDC's failures included two days where only two counts were performed, four days where only one count was performed, and one day where no count was performed and documented.

160.    During these inmate counts, one major role of jail staff is to ensure that each inmate is alive and breathing before being counted.

161.    OSDH also found that the OCDC was repeatedly and routinely failing to perform and document sight checks, with 25 different unit logbooks all showing that sight checks were not performed nor documented. Continued sight check failures were noted for inmates

requiring frequent observation such as those on mental health observation, in the medical unit, on suicide watch and juveniles.

162.    OSDH interviews with several juvenile male inmates stated they only see staff in the pod during mealtime, meaning no sight checks were being performed and interviews with several inmates on floors 12 and 13 indicated that there was no jail staff presence in those units on a regular basis.

163.    OCDC policy 4310.02 "Sight Checks" requires that the Camera Ops post will be notified of sight checks for camera observation and accountability – but OSDH discovered that only a few sight checks were noted in the Camera Ops log with no indication of the type of sight check (15-minute, 30-minute, or hourly) on June 17th-23rd.

164.    OSDH also found that windows on the 2nd, 4th, 6th, 8th, 10th, 12th, and 13th floors were still scratched with less than 50% visibility despite Administrator and Trust's response to the March 30th inspection, wherein the Administrator and Trust stated they would be replacing those windows. The scratched windows prevent adequate sight checks on inmates.

165.    OSDH also found that three cells adjacent to cell number 8 in unit 4 Charlie had holes knocked out of the concrete walls, allowing inmates to move between all four cells. Five inmates were observed in that cell number 8 with black eyes.

166.    OSDH also found that Administrator and Trust failed to develop and implement written policies pertaining to medical examinations of inmates involved in a use of force incident as required by the Oklahoma Jail Standards. In fact, when OSDH asked to see the written policy on use of force in the OCDC, Administrator could not even provide one.

167.    OSDH also found that Administrator and Trust failed to develop and implement written policies regarding the use of restraints within the OCDC. In fact, when OSDH asked to see the written policy on use of restraints in the OCDC, Administrator could not even provide one.

168.    During this June 2021 inspection, the jail was still found to be failing to report serious injuries to inmates or injuries/conditions warranting sending the inmate to an outside medical facility to OSDH as required, despite prior representations measures had been put in place to report all such instances.

169.    OSDH requested the facility's Admission and Release records, called a FIT log, which pertains to the medical conditions of inmates when admitted and if released due to injury or medical condition – but Administrator and Trust failed to produce them for the period from June 7-23, 2021, indicating the records did not exist.

170.    OSDH also found that the OCDC failed to report serious suicide attempts to OSDH, with records revealing that multiple inmates had been transferred to outside medical facilities due to serious suicide attempts but that not a single one of those attempts was reported to OSDH as required.

171.    OSDH found the OCDC was not in compliance with the requirements to provide 24-hour supervision of inmates, with inspection revealing that the intercom system – used for inmates to request emergency assistance.

172.    Interviews with several inmates found that those inmates had not seen or read the Inmate Handbook – required to be provided to each inmate – and were completely unaware they could dial 911 on the intercom for an emergency. Inspection found that in multiple

housing pods there were no Inmate Handbooks displayed as required.

173. Testing of the Emergency Reporting phone system was conducted by dialing 0, 0# and 911 in several inmate housing pods and were found to not be working. Interviews with several inmates found that their calls for assistance have gone unanswered or their phones/intercoms did not work.

174. Interviews with staff revealed that many phones and/or intercom systems throughout the facility were not working, despite Administrator and Trust's previous representations that all systems would be and had been fixed in response to the March 30 notice of deficiencies identifying this same problem.

175. OSDH found that the OCDC was out of compliance with requirements regarding supervision of inmates, with staff and inmates reporting that there is no detention officer on duty at all times in each housing pod where inmates are confined, in violation of the Oklahoma Jail Standards. Review of the staff roster for June 19-20, 2021, revealed that from 6 p.m. on the 19th through 6:00 a.m. on the 20th, one whole floor had no officer assigned to it.

176. OSDH's observations, interviews, and record reviews revealed that the OCDC failed to ensure sufficient staffing to perform all assigned functions relating to security, custody, and supervision of inmates. This finding was noted as a Repeat Deficiency. OSDH found that on June 12th, 13th, 23rd, and 24th, 2021, wound care, medical rounds, and even medication pass in at least four pods were not conducted at all – with a notation of "no escort staff available."

177. Records reviews found that in the month of June 2021, at least 7 outside medical

appointments were missed due to no staff escort.

178. Interviews with several detention officers reported that being required to perform additional duties on multiple floors admittedly resulted in minimal direct inmate supervision in the pods, missed sight checks, late meals, lack of medical care, and poor sanitation.

179. OSDH observed an inmate cuffed to a bar in the hallway of the 8th floor, who stated he was waiting to be seen by medical and had been waiting a long time.

180. Pursuant to OCDC policy 4310.02, juvenile inmates are to be directly supervised by staff with sight checks every thirty minutes. Inspectors observed that at the time of inspection one pod was not staffed at all. Further, review of the logbook for one unit on the 13th floor revealed that sight checks were routinely missed.

181. OSDH also found the OCDC in violation of the Oklahoma Jail Standard requirement to have written policies and procedures to provide adequate health care in the jail, including emergency medical services. In fact, the specific Jail Standard at issue – OAC 310:670-5-8(1) requires Administrator to develop the facility's health care plan with the assistance of the designated medical authority for the jail – in this case Defendants Cooper and Turn Key.

182. OSDH found the OCDC out of compliance with this standard because, when requested, the facility administrator could not provide the policies and procedures for medical and healthcare services which should have included emergencies, sick call, clinical referrals, and medication.

183. OSDH also found the OCDC repeatedly deficient as to the observation of inmates who

are at risk medically and/or psychiatrically. Specifically, OSDH found the OCDC out of compliance with the obligation to perform an intake screening on all inmates immediately upon admission to the facility and before being placed in the general population or housing area. Going further, the jail was required to frequently observe an inmate whose screening indicates a significant medical or psychiatric problem until the appropriate medical evaluation had been completed.

184.    Defendants Trust and Administrator were all notified of this death and the findings of the subsequent investigation by the OSDH after the investigative report was delivered to the OCDC on July 13, 2021.

Death of an inmate on June 24, 2021

185.    On June 24, 2021, an inmate was found deceased in Men's Holding cell # 5. The inmate had been booked into the jail at 12:58 a.m. on June 24, 2021 for driving under the influence and resisting arrest. The inmate was combative during the booking process and was restrained and moved to cell # 5 in the booking area. The inmate was found dead in that cell at approximately 3:26 p.m. that same day with the Medical Examiner estimating that the inmate had actually been deceased for 8 hours.

186.    Video review of that booking area, revealed that 12 sight checks were missed on that date between 1:17 a.m. and 4:23 p.m.

187.    Defendants Trust and Administrator were all notified of this death and the findings of the subsequent investigation by the OSDH after the investigative report was delivered to the OCDC on July 12, 2021.

Oklahoma Multicounty Grand Jury Investigation 2022-2023

188. The Oklahoma Multicounty Grand Jury ("OMGJ") investigating the conditions and practices of the OCDC while under the control and authority of Administrator and Trust made significant findings of the practices, conditions, and situation inside the OCDC.

189. The OMGJ reviewed and received evidence related to the OSDH findings of deficiencies discussed herein, going all the way back to the assumption of control over OCDC by Trust and Administrator. The OMGJ found that the administration of the OCDC – Administrator and Trust – had not taken sufficient corrective action to remedy those deficiencies.

190. The OMGJ made the following findings:

    a. the design and state of the OCDC was a problem interfering with the ability of detention officers to respond quickly in emergency situations.

    b. There were three major issues leading to deaths within the OCDC, two of which were inadequate health screening during the intake process and the failure of detention officers to conduct proper sight checks.

    c. sight checks have not been adequate in the OCDC and that falsified logs have led to multiple deaths within the jail.

    d. that Administrator did not take proactive or effective steps to curb the significant death rate in the OCDC.

    e. the OCDC was significantly understaffed as to detention officers.

    f. deaths in the OCDC were not being investigated as homicides unless there were apparent signs of an intentional criminal act.

    g. OCDC had no system to actually request and receive autopsy reports from the Office

of the Chief Medical Examiner for deaths that occurred in the OCDC.

h. the Chief Investigator responsible for investigations pertaining to deaths in the OCDC did not have the experience or training to investigate homicides.

i. OCDC routinely withheld investigations into deaths at OCDC from the Oklahoma County District Attorney, who has jurisdiction over crimes occurring in the OCDC.

j. not all investigators within the investigations division communicated with the District Attorney's office and that two investigators who routinely communicated with the District Attorney's office were both fired.

k. during a meeting regarding a case where a detention officer falsified a sight check log which resulted in an inmate dying in the jail, the District Attorney inquired about actual staffing levels in the jail and whether it was feasible to adequately conduct sight checks with those staffing levels. In response to that inquiry the in-house OCDC attorney told an OCDC investigator that they would "never give that type of information to the DA." That same OCDC attorney then began "modifying" police reports regarding incidents at the jail before they were submitted to the district attorney, with the purpose of hiding problems related to staffing levels, conducting sight checks, and the falsification of sight check logs and preventing outside investigations into deaths and severe incidents at the OCDC.

*Ongoing Problems, Policies, Procedures, and Customs of Defendant Turn Key*

191.  Prior to Thomas' detention, Turn Key had a pattern and practice of providing deficient healthcare to inmates/detainees across many jails where Turn Key was the contracted for medical provider, with such failures including failing to provide access to needed mental

health/psychiatric care, failure to escalate inmate/detainee medical/mental health needs to appropriate level healthcare providers, failing to conduct medical screenings/intakes on inmates/detainees known to be suffering serious mental health/psychiatric issues, and failing to transfer inmates/detainees to outside medical facilities who could actually provide the necessary care to inmates/detainees whom Turn Key – and its employees – were aware were unable to be properly treated in the current jail facility.

192.    Turn Key had a widespread pattern of failing to provide medical evaluations and medical and mental health care to inmates with serious medical/mental health needs prior to Thomas' detention. Specifically at the OCDC:

    a.    In late 2018, Amiremad Nayebyazdi was arrested while in a psychotic state and being treated at an inpatient psychiatric facility at St. Anthony hospital. His treatment included consistent psychiatric medication to stabilize him. Mr. Nayebyazdi was denied medication, a medical evaluation, and medical/mental health care by Turn Key and its staff for five weeks after his arrival at the jail. This resulted in significant injuries due to a suicide attempt involving a fall from two stories up while in an untreated, known psychotic state;

    b.    On July 22, 2018, Blaine Petrie was admitted to the OCDC despite having sustained a head injury in a car wreck and specifically being classified as not fit for incarceration at St. Anthony Hospital. Petrie was taken to the OCDC anyway. There, his diagnosis and discharge paperwork were provided to Turn Key and its medical staff, a cursory pre-booking screening" was performed with Turn Key's staff so careless or undertrained that they failed to note in the screening that Mr. Petrie had sustained a

head injury within the past 24 hours, despite having and reading his medical records from St. Anthony. A second Turn Key nurse evaluated Petrie at 1:33 a.m. July 23, 2018, and specifically noted he was found to be not fit for incarceration. Despite those medical records and recommendations, that Nurse, due to deliberate indifference or being an undertrained LPN, determined Petrie fit for incarceration despite having done no diagnostic testing. Petrie was then assigned to General Population with no medical supervision. Petrie was found dead in his cell at 10:00 p.m. that same day due to his untreated head injury.

c.  In January 2019, an inmate with known serious mental health issues, including PTSD, depression, anxiety, and previous suicide attempts, died by suicide in her cell in the General Population area of the OCDC. The inmate was known to Turn Key and its staff as being in need of significant mental health treatment and a suicide risk due to mental health issues, including having been provided court records of mental health court assignment and medical records indicating the same. Despite classifying the inmate as a serious mental health patient, and with full knowledge that the inmate was place in General Population due to overcrowding in the mental health unit, Turn Key and its medical staff provided no mental health care nor any medical supervision to the inmate since she was admitted in October 2018.

d.  In July 2020, after an inmate had surgery to repair a broken ankle, including the placement of hardware in the ankle, Defendant Turn Key and its employees ignored clear and known signs of bent or abnormal hardware causing the inmate serious pain from July 30, 2020, through February 24, 2021. Turn Key and its medical staff were

47

aware of significant hardware problems causing the pain via x-rays they conducted. However, Turn Key and its medical staff did nothing to correct the issue, which ultimately resulted in the inmate's severely restricted ability to walk, long-term substantial pain and suffering, and the inmate having two surgeries to remove the hardware.

e.  In January 2021, an inmate housed in the medical unit was beaten to death in his cell by his cellmate. The victim repeatedly used the phone in his cell to call for help, but no calls were ever answered. The calls from that unit were directed to the medical staff offices, manned by Turn Key's medical staff. The phone was not answered because it had been set to mute to ignore all inmate calls in the medical unit. Turn Key's medical staff muted that phone because they were deliberately indifferent to the welfare of inmates housed in the medical unit, were undertrained, had no policies and procedures to follow in the performance of their job, and/or were not trained on their constitutional obligations to provide access to medical care.

f.  On March 24, 2021, Chandra Graham suffered serious chemical burns to her face caused by a substance on the floor of her cell. After Graham began begging for help or water to clean her face, she was moved to a new cell in the behavioral health unit. During her time in that cell, she attempted to call, using the intercom/phone system in her cell over 50 times without answer. Turn Key's medical staff first saw Graham on March 27, 2021, and only treated Graham for a rash and swelling to her face, but only provided her Benadryl and a cream for five days before she was ultimately transferred to another jail. That jail released her from custody due to her obvious,

serious medical issues. She was diagnosed at a hospital with chemical burns, bacterial conjunctivitis of both eyes, a severe facial rash and facial cellulitis. The lack of adequate care in the face of obviously serious injuries was due to the deliberate indifference of Turn Key's medical staff, the overreliance on undertrained and underqualified LPNs, a lack of training as to when medical symptoms/conditions warrant contacting a higher level provider or transferring the inmate to an outside facility, and/or a lack of any clinical guidelines or policies and procedures for Turn Key's medical staff to follow.

g. Christa Sullivan died in the OCDC in April 2021 due to untreated mental health and medical needs, after Turn Key failed to properly treat her or transfer her to an outside facility capable of caring for her despite months of warning signs of serious medical needs and multiple statements in her medical records noting that she needed to be transferred to an outside facility, as further described in paragraphs 219-223;

h. Lee Chouteau died in the OCDC on June 24, 2021, after being booked into the OCDC at approximately 1:00 a.m. and was known to be heavily intoxicated and/or under the influence of drugs. After book-in, Turn Key medical staff never evaluated or checked on Mr. Chouteau during his detention, which resulted in Mr. Chouteau dying in his cell at approximately 7:30 a.m. No medical staff or jail staff discovered Mr. Chouteau was unresponsive – and dead – until 3:30 p.m.;

i. On August 10, 2021, an inmate – who had been vomiting consistently for days without medical treatment – became unresponsive laying on a bench directly outside of the medical unit where Turn Key staff was working. The inmate was pronounced dead

approximately one hour later. The inmate died of untreated medical issues causing the persistent vomiting and death two days later.

193. In addition to the other OCDC instances of Turn Key failing to provide proper care, medical evaluations, and referrals for inmates with mental health issues, Turn Key had a pattern of failing to provide medical evaluations and medical and mental health care to inmates with serious medical/mental health needs prior to Thomas' detention:

a. On November 7, 2019, Lorri Tedder was detained at the Rogers County Jail and was experiencing an obvious, known mental health/psychiatric crisis. Jail medical staff – employed by Defendant Turn Key – failed to perform any mental health or medical evaluation of Tedder, failed to provide Tedder any mental health/psychiatric treatment, and failed to refer her to an appropriate higher-level provider or to an outside facility actually capable of assessing and treating Tedder. Instead, she was left in the jail in a condition and scenario in which the use of force by jailers was an obvious and likely outcome, posing a risk to the health and safety of Tedder. Tedder died after being subjected to excessive force in response to her combative nature caused by her psychosis and delusions.

b. In June 2016, Turn Key failed to conduct an initial health assessment on an inmate in the Garfield County Jail and the inmate was booked without prescribed medications for heart disease, hypertension, coronary artery disease and depression. As a result, the inmate started experiencing hallucinations and exhibiting delusions. Instead of appropriate medical and mental health treatment, the inmate was placed in a restraint chair where he remained until his death two days later. Throughout that time, Turn

Key's employee(s) in the jail provided no medical or mental health care, did not refer the inmate to an appropriately qualified higher level provider, or refer him to a facility actually capable of providing needed mental health care and medical care.

c.  In June 2017, Turn Key and its employee(s) failed to perform a medical evaluation or provide any medical or mental health treatment to an inmate who could not sit still or appropriately answer questions during an attempted intake and who was suffering from hallucinations. Instead, Turn Key and its employee(s) left the inmate in the jail with no treatment, no referral to a higher-level provider, no medical evaluation, and no referral to an outside facility actually capable of evaluating and treating the inmate. Instead, he was left in the jail in a condition and scenario in which the use of force by jailers was an obvious and likely outcome, posing a risk to the health and safety of the inmate. The inmate died after being subjected to excessive force in response to his combative nature caused by his condition and hallucinations.

d.  On September 24, 2017, a 25-year-old man named Caleb Lee died in the Tulsa County Jail after Turn Key medical staff, in deliberate indifference to Mr. Lee's serious medical needs, provided nearly nonexistent treatment to Mr. Lee over a period of 16 days. Mr. Lee was not seen by a physician in the final six days of his life at the Tulsa County Jail (and only once by a psychologist during his entire stay at the jail), despite the fact that other Turn Key staff noted that he was suffering from: tachycardia, visible tremors, psychosis, symptoms of delirium, stage 2 hypertension, paranoia, and hallucinations. Turn Key staff failed to transfer Mr. Lee to an outside medical provider despite these obviously serious symptoms that

worsened by the day until Mr. Lee's death on September 24, 2017.

e. In 2018, an inmate died of suicide in the Tulsa County Jail after his clear signs of depression and deteriorating mental condition went ignored and not evaluated by Turn Key and its employee(s) working in the jail. The inmate exhibited serious signs of depression and suicidal behavior, but was provided no mental health screening, no mental health treatment, no referral to a higher-level provider capable of treating the inmate, and no designation of the inmate as a suicide risk.

f. In May 2020, an inmate at the Saline County Detention Center in Arkansas, a facility where Turn Key is the contracted medical provider, filed suit for Turn Key's persistent and ongoing failure to provide him mental health care and access to appropriate and necessary mental health specialists for a period of at least two months.

g. In 2017, at the Pulaski County jail in Arkansas, where Turn Key is the contracted medical services provider, an inmate suffering from psychosis was detained for days without a medical evaluation and eventually deteriorated and died – without any mental health care or medical care – of an untreated medical condition,, in part due to the lack of medical evaluation and lack of treatment for her psychosis. Further, the inmate was not referred to an appropriate higher level provider capable of evaluating and/or treating her psychosis, nor was she referred to an outside facility actually capable of evaluating and treating her medical and mental conditions.

194. Further examples of Turn Key's longstanding deficient healthcare system and practices include:

a. In 2009, Lacee Danielle Marez was detained at the Cleveland County Jail. ESW

Correctional Healthcare, now Turn Key Health Clinics, LLC, was the jail medical provider at the time. Marez, then 21, was taken into custody for missing a court appearance and allegedly struck her head on a concrete floor during a struggle with jail staff, causing a traumatic brain injury. Left in a holding cell for three days, Marez went into a coma and also suffered a heart attack, leading her to live in a permanent vegetative state. Marez repeatedly asked for medical treatment over a period of several days. She began vomiting, urinating on herself, and laying lethargic on her cell bed. A critical care physician at Norman Regional Hospital wrote in a report filed with the court that jail medical staff neglected to treat Marez after a head injury. "Lack of medical care during this time indicates either direct disregard or inadequate recognition of this woman's progressive and ultimately nearly fatal illness," the doctor wrote.

b.  In 2011, when Turn Key was still known as ESW Correctional Healthcare, Curtis Gene Pruett, 36, died in a holding cell at the Cleveland County Jail in October. He died after jail staff ignored his repeated pleas for emergency medical attention. Pruett was booked into the jail after police arrested him on suspicion of public intoxication. Pruett told jail staff that he had high blood pressure and that he was in severe pain, but they ignored his requests. Surveillance video showed Pruett doubled over clutching his chest at the jail, but ESW's nurse told him he was faking his condition. Pruett died of a heart attack.

c.  In November 2014, Robert Autry nearly died while detained at the Cleveland County Jail after Turn Key employees ignored repeated complaints regarding a

sinus infection Mr. Autry had contracted. Sinus infections were extremely dangerous and potentially life-threatening for Mr. Autry due to a prior traumatic brain injury. This information was disclosed to Turn Key and its employees and yet the obvious signs of a sinus infection in Mr. Autry were ignored until he nearly died and ultimately had to have brain surgeries to save his life.

d.  In 2015, Turn Key failed to schedule a psychological appointment with a doctor for James Jordanoff to regulate his medications and get the medications he had actually been prescribed for over two months.

e.  In April 2016, Austin Vance died after being detained at the Cleveland County Jail. Vance died due to complications of excited delirium after he was denied medical care despite his obvious symptoms and his statements to arresting officers that he had taken Adderall. Instead of medical treatment, Vance was placed in a restraint chair and covered with a hood and remained there until he was found unresponsive. He was pronounced dead at the hospital shortly after.

f.  In January 2018, Marconia Kessee died of drug toxicity in the Cleveland County Jail after Turn Key wholly failed to take any actions – including performing a medical intake evaluation – in response to the profuse sweating, inability to walk, incoherent speech, and seizure-like convulsions of Mr. Kessee and instead put him in a cell where he died within hours. Cleveland County jailers were aware of the same symptoms and performed wholly inadequate, less than 1-second-long sight checks of Mr. Kessee throughout the last hours of his life. The Turn Key staff did not even perform a single sight check of Mr. Kessee during the time he lay dying,

until he was found completely unresponsive.

g. In October-November 2020, an inmate at the Cleveland County Jail slowly died of his known congestive heart failure as Turn Key and its employees wholly ignored the obvious and severe worsening of his condition, inclusive of extreme edema and swelling (so bad at points the inmate could not see due to facial and eye swelling), fluid weeping from his legs, urinary incontinence, and clear signs of infections of the weeping wounds on his legs including skin sloughing off of his leg. The inmate required use of a wheelchair and had mobility issues caused by his condition and fatigue related to that condition. After he died, that inmate was found to also have significant pressure ulcers on his perineum. Turn Key and its employees failed to properly treat the inmate's obviously worsening condition (with nursing staff failing to follow orders from higher level providers entirely), failed to refer him for evaluation and treatment by an appropriately qualified higher level provider, and failed to refer him to an outside facility actually capable of caring for the inmate and his serious condition, decline, and needs.

h. Throughout the period from June through October 2019, an employee of Turn Key, and other Turn Key medical personnel at the Cleveland County Jail failed to take any steps to obtain past medical and treatment information for an inmate who notified them of two chronic health conditions – HIV and hypertension. That inmate, Bryan Davenport, was not seen by a physician, physicians' assistant, or nurse practitioner for nearly a month after his arrival at the jail. Throughout that time, Davenport provided the names of his providers, his need for his HIV

medications, and the names of those medication. When Turn Key's employee nurse finally saw Davenport, she informed him that she did not want to start treatment pertaining to his HIV and left him without vital medications for several months. Turn Key also refused to treat Davenport under their "chronic care" protocol, instead requiring Davenport to submit multiple sick calls just to attempt to get his medications so that Turn Key and Cleveland County could charge Davenport $15 per visit.

i.  An El Reno man died in 2016 after being found naked, unconscious, and covered in his own waste in a cell at the Canadian County Detention Center, while ostensible under the care of Turn Key medical staff. The Office of the Chief Medical Examiner found the man had experienced a seizure in the days before his death.

j.  A man in the Creek County Jail, also under the purported "care" of Turn Key, died in September 2016 from a blood clot in his lungs after his repeated complaints – over several days – of breathing problems were disregarded by responsible staff, and he lost consciousness.

k.  Another man, Michael Edwin Smith, encountered deliberate indifference to his serious medical needs at the Muskogee County Jail in the summer of 2016. Mr. Smith became permanently paralyzed when the jail staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling. Smith claims that cancer spread to his spine, causing a dangerous spinal compression, a condition that can cause permanent paralysis if left untreated. Smith asserts that he told the Turn Key-employed

physician at the jail that he was paralyzed, but the physician laughed at Smith and told him he was faking. For a week before he was able to bond out of jail, Smith was kept in an isolation cell on his back, paralyzed, unable to walk, bathe himself, or use the bathroom on his own. He was forced to lay in his own urine and feces because the jail staff told Smith he was faking his paralysis and refused to help him.

l.  In November of 2016, Muskogee County Jail and Turn Key staff disregarded, for days, the complaints and medical history of inmate James Douglas Buchanan. As noted by Clinton Baird, M.D., a spinal surgeon:

> [Mr. Buchanan] is 54-year-old gentlemen who had a very complicated history... [H]e was involved in being struck by a car while riding bicycle several weeks ago... *He ended up finding himself in jail and it was during this time in jail that he had very significant deterioration in his neurologic status. [I]t s obvious that he likely developed beginnings of cervical epidural abscess infection* in result of his critical illness [and] hospitalization, but then *while in jail, he deteriorated significantly and his clinical deterioration went unrecognized and untreated until he was nearly completely quadriplegic.* (emphasis added)

m.  Mayfield v. Briann, U.S. District Court for the Eastern District of Arkansas, Case No. 16-cv-736-SWW, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's severe dental needs.

n.  Moore v. Briann, U.S. District Court for the Eastern District of Arkansas, Case No. 17-cv-115-BRW, wherein Turn Key was alleged to have ignored an inmates' worsening hip pain and disfunction for eleven months, leading to difficulty walking and constant severe pain.

o.  Wedsted v. Lowerily, U.S. District Court for the Eastern District of Arkansas, Case

No. 17-cv-263-BSM, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's severe dental needs.

p. Sawyers v. Edwards, et al., U.S. District Court for the Western District of Oklahoma, Case No. CIV-17-52-HE, wherein Turn Key was alleged to have been deliberately indifferent to the serious medical needs of Sawyers, a plaintiff whom had underwent emergency back surgery after an auto accident who had been transported to the Canadian County Detention Center. The Turn Key staff received the medical records including Plaintiff's prescriptions and was also informed of the required two-week follow-up appointment, but failed to correctly administer Plaintiff's medications and failed to take Plaintiff to the required two-week follow-up appointment— which resulted in Plaintiff removing his own original dressing from surgery after five weeks. Plaintiff filed multiple requests for grievances and after two transfers saw his doctor for the follow-up visit eighty-nine days after surgery.

q. Sam v. Virden, et al., U.S. District Court for the Northern District of Oklahoma, Case No. 17-cv-415-TCK-FHM, wherein Turn Key was alleged to have been deliberately indifferent to the medical needs of Sam, a detainee at Osage County Jail, who shattered his patella. Turn Key staff only provided ibuprofen and a medical request form to Sam two days later. After being detained at the Osage County Jail, Sam shattered his patella in a jail cell and then he was placed in isolation in order for the jail staff to "keep an eye on him." Three days later he received an x-ray and received no medical attention for ten days in which then only receives a

knee brace. This was proceeded by another sixteen days of no medical attention, which resulted in the transfer of custody and led to an ultimate knee surgery.

r.   Smith v. Board of County Commissioners of Muskogee County, U.S. District Court for the Eastern District of Oklahoma, Case no. 17-CV-90-KEW, wherein Turn Key was alleged to have been deliberately indifferent to the medical needs of Smith, a cancer patient who had prostate cancer that had metastasized to his spine and pelvic bone causing him to undergo intensive and aggressive radiation and other treatments. After being detained at the Muskogee County Jail, Smith developed symptoms such as severe pain in his back and chest, numbness and a frost-bite feeling in his chest that spread down to his feet, ultimately turning into numbness and permanent paralysis. Despite the obvious symptoms of severe medical distress, Turn Key failed and refused to provide adequate medical care or transport Smith to a hospital. Only upon bonding out of the jail did Smith receive adequate treatment; however, his paralysis was permanent.

s.   Foutch v. Turn Key Health, LLC, U.S. District Court for the Northern District of Oklahoma, Case No. 17-cv-431-GKF-mjx, wherein Turn Key was alleged to have failed and refused to provide access to a physician for Foutch and failed and refused to place him under medical observation despite shortness of breath, difficulty breathing, and coughing up blood. Turn Key was further alleged to have failed to provide Foutch with the prescribed number of breathing treatments from an examining physician, and to have failed to provide any medical care as Foutch's condition obviously worsened over several days until Foutch was found

unresponsive in his cell after foaming at the mouth and coughing up blood. Foutch was pronounced dead 2 minutes after arrival at a hospital.

t.    Sanders v. Creek County Board of County Commissioners, U.S. District Court for the Northern District of Oklahoma, Case No. 17-cv-492-JHP-FHM, wherein Turn Key was alleged to have ignored and failed to provide medical care to decedent Sanders despite noting that she had been suffering from diarrhea and her mental state had been rapidly declining for two to three weeks. Turn Key failed to seek appropriate medical care for Sanders until the 35th day after she entered the Creek County Jail, when they transported her to the hospital fully incapacitated and on the brink of death. At the hospital, Sanders was diagnosed with severe sepsis with shock, acute hypoxic respiratory failure, acute kidney injury, hepatopathy, and other serious conditions. Sanders died the day after arrival at the hospital.

u.    Allen v. Maruf, et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:17-cv-00863-SWW-JTR, wherein Turn Key was alleged to have refused to provide Allen, a jail detainee in Pulaski County Regional Detention Center, with medications that he had took since February of 2017 for degenerative bones, knee problems, disc problems, and also to keep the Plaintiff's arms, hands, legs, and feet from going numb that was prescribed by the Plaintiff's Doctor at the VA Hospital. Turn Key also denied the approval of a walking cane to prevent the plaintiff from falling.

v.    Ellis v. Brown, et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:17-cv-545, wherein Turn Key was alleged to have denied medications for the

plaintiff's diagnosed neuropathy, instead only providing medication for heartburn based on the Turn Key nurse's statements that she knew that was all the plaintiff's condition was.

w. Yancy v. Turn Key Health, et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:17-cv-455, wherein Turn Key was alleged to have denied access to appropriate medical care with existing medical condition involving internal bleeding despite obvious signs of medical need including significant amount of blood in stool causing the plaintiff prolonged pain from his conditions.

x. Alexander v. Pulaski County, Arkansas, U.S. District Court for the Eastern District of Arkansas, Case No. 18-cv-0046-BSM, wherein the inmate was alleged to have been 100% disabled, and suffered sickle cell anemia, asthma, and rheumatoid arthritis, conditions which were alleged to have been disclosed to Turn Key. The inmate was alleged to have been cold, shaking and had been throwing up. Turn Key's nurse was alleged to have disregarded calls for medical help by the inmate and deputies, including denying plaintiff her "asthma pump." On December 14, 2016, allegedly as a result of Turn Key's deliberate indifference to the inmate's medical needs, the inmate began convulsing and having difficulty breathing. The inmate died as a result.

y. McDonald v. Carpenter, U.S. District Court for the Eastern District of Arkansas, Case No. 18-cv-172-SWW, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's anxiety medication needs, leading to elevated anxiety and an attempted suicide.

z. Royston v. Board of County Commissioners of the County of Bryan, U.S. District Court for the Eastern District of Oklahoma, Case No. 18-CV-265-RAW, wherein Turn Key was alleged to have failed to provide 24-hour access to a physician or midlevel provider for the Bryan County jail, failed to conduct a medical intake screening, failed to provide any care from a mental health provider, physician, midlevel provider, or a registered nurse despite obvious signs of medical distress, and failed to provide medical care after Royston hit her head against a concrete wall and despite obvious signs of injury all over Royston's body. Royston ultimately fell into a coma for several days.

aa. Bowen v. Ring, U.S. District Court for the Eastern District of Arkansas, Case No. 18-cv-172-SWW, wherein plaintiff alleged he was severely beaten by an officer during his arrest. At the jail, Turn Key was alleged to have been deliberately indifferent to obvious signs of severe brain injury and to have delayed medical care which was alleged to have resulted in permanent brain damage. Turn Key was alleged to have poorly trained and equipped its LPN to deal with critical, but predictable medical emergencies, commonly encountered in a jail setting.

bb. Thompson v. Turn Key Health Clinics, LLC, U.S. District Court for the Western District of Arkansas, Case No. 18-cv-5092-PKH, wherein Turn Key was alleged to have refused to administer plaintiff's prescription medications and refused to treat plaintiff's broken bones.

cc. Buchanan v. Turn Key Health Clinics, LLC, U.S. District Court for the Eastern District of Oklahoma, Case No. 18-CV-171-RAW, wherein Turn Key was alleged

62

to have failed and refused to provide medical observation, evaluation or access to medical care despite Buchanan's paralysis in his left arm beginning the day after his arrival at the Muskogee County Detention Center. Four days later Buchanan developed paralysis in his right arm. Despite these obvious signs of medical distress, Turn Key did not move him to medical observation, schedule an appointment with a physician, or even check his vitals. Turn Key was alleged to essentially have provided no care to Buchanan even days later when Buchanan suffered paralysis of both legs as well. Turn Key medical staff was alleged to have failed and refuse to provide appropriate and immediate medical assistance when a Turn Key nurse finally evaluated Buchanan and noted his paralysis. Nine hours after that evaluation, another Turn Key nurse evaluated Buchanan and finally sent him to the hospital where he was diagnosed with quadriplegia and a cervical epidural abscess. Buchanan suffered permanent injury and paralysis as a result of Turn Key's failures.

dd. Avery v. Turn Key Health Clinics, LLC, U.S. District Court for the Western District of Arkansas, Case No. 18-cv-5075-PKH, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's severe dental needs.

ee. Sanders v. Gifford, et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:18-cv-712, wherein Turn Key was alleged to have repeatedly given Sanders another inmate's medication, resulting in seizures, vomiting, and pain to the Plaintiff.

ff. Nabors v. Humphrey, et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:18-cv-664, wherein Turn Key was alleged to have given

inmate wrong amount of seizure medication, resulting in seizures and a busted lip. Inmate was ultimately taken to hospital twice, and had physical therapy prescription for trouble walking. Turn Key was alleged to have only provided a cane with no physical therapy.

gg. Lee v. Holladay, U.S. District Court for the Eastern District of Arkansas, Case No. 19-cv-178-LPR, wherein Turn Key was alleged to have caused the death of an inmate with a known seizure disorder by failing to provide the inmate's prescription anti-seizure medication, improperly medicating the inmate with a anti-psychotic medication and then allowing the inmate to be placed in a restraint chair with a spit mask after he had been pepper sprayed, all in deliberate disregard of the inmate's obvious medical conditions. The inmate went into cardiac arrest and died.

hh. Davis v. Pulaski County, Arkansas, U.S. District Court for the Eastern District of Arkansas, Case No. 19-cv-643-JM, wherein Turn Key was alleged to have deliberately disregarded plaintiff's severe medical condition by failing to provide plaintiff with necessary insulin causing a significant drop in plaintiff's blood sugar which caused plaintiff injuries, including a broken ankle which had to be surgically repaired with hardware.

ii. Causey v. Pulaski County Medical, et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:19-cv-305, wherein Turn Key was alleged to have denied proper prescribed pain medications to partially paralyzed inmate with multiple injuries and chronic conditions. Turn Key was alleged to have failed to provide corrective footwear for inmate with injury to left foot, resulting in a fall and his left

foot healing improperly.

jj. Winningham v. Roberts, et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:19-cv-706, wherein Turn Key was alleged to have failed to provide treatment to inmate reporting a separated shoulder joint and/or broken clavicle after falling out of bunk bed.

kk. Bowlds v. Turn Key Health, et al., U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-726-SLP, wherein Turn Key was alleged to have been deliberately indifferent to the medical needs of Bowlds, a pretrial detainee at the Logan County Detention Center, when they refused to allow him access to the dentist— which resulted in acute pain. Bowlds experienced an extreme headache which lasted twenty-four hours due to a chipped tooth which allegedly left an exposed nerve. Turn Key only gave Bowlds the option to complete several treatments of medication prior to even being considered to see a dentist— which can take up to ninety days, unless Bowlds paid for the dentist visit with his own money, which he did not have the means to do. Turn Key was also alleged to have violated the 8th Amendment ban against cruel and unusual punishment and the 14th Amendment of the U.S. Constitution.

### FIRST CAUSE OF ACTION: VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS

**As to Defendants Trust, Administrator, and Del City, and Turn Key Health**
**42. U.S.C. § 1983**

195.  Plaintiff incorporates all prior paragraphs as if fully set forth herein.

196.  Defendants Trust, Administrator, and Del City were directly involved in the violation

of Plaintiff's constitutional Rights in the following manner:

### I.  Maintaining a policy/ custom with deliberate indifference to the violation of citizen's Constitutional rights

197.  Defendants Trust and Administrator maintained a policy/custom within the OCDC of not investigating complaints made by inmates accusing Inmate Lamb of sexual harassment, misconduct, and/ or assault.

198.  Such policy is evident in this matter by Defendants Trust and Administrator choice not to investigate the complaints received about Lamb's sexual harassment, misconduct, and/ or assault prior to the sexual assault of Plaintiff.

199.  Further instances of such decisions not to investigate other complaints of sexual harassment, misconduct, and/ or assault cannot be discovered without the aid of discovery due to the nature of such policy: not publicly acknowledging such complaints and by virtue of the policy to not investigate such claims, no records exist in the public domain which Plaintiff could obtain or reference herein.

200.  This policy was put in place/ continued with full knowledge:

    a.  Of the pervasiveness of sexual harassment, misconduct, and assault by inmates of the OCDC.

    b.  The special nature of such harassment, misconduct, and/ or assault by police officers go underreported, and

    c.  That a sexually predatory inmate would likely continue sch sexual harassment, misconduct, and/ or assault without investigation of credible complaints made against that inmate.

201. If this policy/ custom had not been in place, the multiple complaints of sexual harassment, misconduct, and/ or assault of Lamb would have been properly investigated prior to his sexual assault of Plaintiff.

202. Had such investigation take place prior to the sexual assault of Plaintiff, Lamb would not have been an unsupervised predator in the OCDC.

203. Had Lamb not been an unsupervised predator in the OCDC on April 1, 2023, the sexual assault of Plaintiff would not have occurred.

204. The decision of Defendants Trust and Administrator to maintain a policy/ custom whereby credible complaints of sexual harassment, misconduct, and assault made against Lamb, and other inmates, were routinely not investigated, caused the deprivation of the Plaintiff's rights; that is, Defendants' offending policy/ custom was so closely related to the deprivation of Plaintiff's rights as to be the moving force that caused the sexual assault on Plaintiff.

205. By reason of the aforementioned acts and omission, Plaintiff has suffered devastating and substantial mental, emotional, physical, and financial damages.

206. Accordingly, Defendants Trust and Administrator are liable to Plaintiff for damages and other relief as set forth herein.

## I.    Deliberate indifference to the failure to train

207. Defendants Trust and Administrator made the decision not to train officers in supervisory capacities to investigate complaints of sexual harassment, misconduct, and/ or assault by inmates under their supervision, and failed to train the detention officers to supervise and/ or discipline inmates under their supervision who have

received complaints of sexual harassment, misconduct, and assault.

208.    The decision not to provide such training to detention officers was made with full knowledge:

    a.  Of the pervasiveness of sexual harassment misconduct, and assault by inmates

    b.  The special nature of such harassment, misconduct, and assault because the offenders are inmates

    c.  The incident of sexual harassment, misconduct, and/ or assault by inmates go underreported,

    d.  That a sexually predatory inmate would likely continue such sexual harassment, misconduct, and/ or assault without investigation of credible complaints made against that inmate,

    e.  That credible complaints had been made against Lamb prior to the assault on Plaintiff,

    f.  Those supervisory officers- including Garner, Eason, Berger, and Cantrell- had failed to take any steps to investigate the credible complaints against Lamb or to place him under close supervision, solitary confinement or take any disciplinary action against him; and

    g.  That there was a high likelihood Lamb would continue the same or escalating sexual harassment, misconduct, and/ or assault.

209.    Had the obvious need for such training not been ignored prior to receiving complaints against Lamb, or if the obvious need for such training had not been ignored after the clear and obvious failure of detention officers to do anything in response to the credible

complaints received against Lamb prior to his sexual assault of Plaintiff, the assault on Plaintiff would not have occurred.

210.    Had detention officers been properly trained to investigate such complaints and/ or to provide remedial training, alternative duty assignments, or discipline to inmates accused of sexual harassment, misconduct, and/ or assault Lamb would not have been an unsupervised predator in the OCDC on April 1, 2023.

211.    Had Lamb not been an unsupervised predator in the OCDC on April 1, 2023 the sexual assault of Plaintiff would not have occurred.

212.    Defendants Trust and Administrator failed to train its detention officers to receive and actually investigate complaints as well as to supervise, take predatory inmates out of cells with other inmates, or discipline such inmates, caused the deprivation of Plaintiff's rights; that is, Trust and Administrator knowing failure to train its detention officers was so closely related to the deprivation of Plaintiff's rights as to be the moving force that caused the sexual assault on Plaintiff.

213.    By reason of the aforementioned acts and omissions, Plaintiff has suffered devastating and substantial mental, emotional, physical, and financial damages.

214.    Accordingly, Trust and Administrator are liable to Plaintiff for damages and other relief as set forth herein.

### I.    Deliberate indifference to the need for supervision

215.    Trust and Administrator made the decision not to take any steps to further supervise Lamb after receiving multiple complaints of sexual harassment, misconduct, and or assault by Lamb.

216. The decision not to provide such training to detention officers, provide remedial training to Detention Officers, assign Lamb to a different cell, or to discipline Lamb in any way after receiving complaints was made with full knowledge:

    a. Of the pervasiveness of sexual harassment misconduct, and assault by inmates

    b. The special nature of such harassment, misconduct, and assault because the offenders are inmates

    c. The incident of sexual harassment, misconduct, and/ or assault by inmates go underreported,

    d. That a sexually predatory inmate would likely continue such sexual harassment, misconduct, and/ or assault without investigation of credible complaints made against that inmate,

    e. That credible complaints had been made against Lamb prior to the assault on Plaintiff,

    f. Those supervisory officers- including Garner, Eason, Berger, and Cantrell- had failed to take any steps to investigate the credible complaints against Lamb or to place him under close supervision, solitary confinement or take any disciplinary action against him; and

    g. That there was a high likelihood Lamb would continue the same or escalating sexual harassment, misconduct, and/ or assault.

217. Had the decision not to provide such training to detention officers, provide remedial training to Detention Officers,  assign Lamb to a different cell, or to discipline Lamb in any way- despite the obvious need for such conduct- not been made, then the sexual

assault on Plaintiff would not have occurred.

218. Had Trust and Administrator acknowledged the clear and obvious need to provide remedial training, alternative duty assignments, or discipline to inmates accused of sexual harassment, misconduct, and/ or assault Lamb would not have been an unsupervised predator in the OCDC on April 1, 2023.

219. Had Lamb not been an unsupervised predator in the OCDC on April 1, 2023 the sexual assault of Plaintiff would not have occurred.

220. Defendants Trust and Administrator failed to train its detention officers to receive and actually investigate complaints as well as to supervise, take predatory inmates out of cells with other inmates, or discipline such inmates, caused the deprivation of Plaintiff's rights; that is, Trust and Administrator knowing failure to train its detention officers was so closely related to the deprivation of Plaintiff's rights as to be the moving force that caused the sexual assault on Plaintiff.

221. By reason of the aforementioned acts and omissions, Plaintiff has suffered devastating and substantial mental, emotional, physical, and financial damages.

222. Accordingly, Trust and Administrator are liable to Plaintiff for damages and other relief as set forth herein.

## I.    Ratification

223. Defendants Eason, Berger, Cantrell, Trust, and Administrator retained policymaking and supervisory authority over the OCDC and, as such final policymaker, acting under the color of law with final policymaking authority concerning the acts of Lamb, ratified such acts and the bases for them.

224.    Defendants Eason, Berger, Cantrell, Trust, and Administrator had full knowledge:

    a.  Of the pervasiveness of sexual harassment misconduct, and assault by inmates

    b.  The special nature of such harassment, misconduct, and assault because the offenders are inmates

    c.  The incident of sexual harassment, misconduct, and/ or assault by inmates go underreported,

    d.  That a sexually predatory inmate would likely continue such sexual harassment, misconduct, and/ or assault without investigation of credible complaints made against that inmate,

    e.  That credible complaints had been made against Lamb prior to the assault on Plaintiff,

    f.  Those supervisory officers- including Garner, Eason, Berger, and Cantrell- had failed to take any steps to investigate the credible complaints against Lamb or to place him under close supervision, solitary confinement or take any disciplinary action against him; and

    g.  That there was a high likelihood Lamb would continue the same or escalating sexual harassment, misconduct, and/ or assault.

225.    Despite having full knowledge of each of the facts set out in paragraph 224, above, Defendants Eason, Berger, Cantrell, Trust, and Administrator, chose not to investigate the complaints against Lamb, to take any steps to discipline him or in any way to tell him to cease such constitutionally-violative conduct.

226.    Instead Defendants Eason, Berger, Cantrell, Trust, and Administrator, ratified the

conduct of Lamb leading up to the assault on Plaintiff.

227.    Despite having full knowledge of each of the facts set out in paragraph 224, above, Defendants Eason, Berger, Cantrell, Trust, and Administrator, chose not to correct, condemn, or in any way show disapproval of the policy and decision to not investigate sexual harassment, misconduct, and/ or assault allegations against inmates.

228.    Instead, Defendants Eason, Berger, Cantrell, Trust, and Administrator, ratified the policy to not investigate sexual harassment, misconduct, and/ or assault allegation against inmates.

229.    Defendants Eason, Berger, Cantrell, Trust, and Administrator, also ratified the specific decision not to investigate the claims against Lamb which were made prior to the sexual assault against Plaintiff.

**Defendant Turn Key Health:**

230.    Plaintiff incorporates all previous allegations and statements herein.

231.    Defendants County, Trust, and/or Administrator delegated final authority to establish policies at the OCDC regarding detainee healthcare to Defendant Turn Key.

232.    Defendant Turn Key, acting on behalf of County, Trust, and/or Administrator, as decisionmaker with final authority to establish municipal policy regarding detainee healthcare, deprived Plaintiff of rights and freedoms secured by the Fourteenth and Eighth Amendments of the U.S. Constitution – specifically freedom from deprivation of adequate medical care constituting cruel and unusual punishment.

233.    The policies, practices, and customs, which were promulgated, created, implemented, and/or utilized by Defendant Turn Key represent the official policies and/or customs of

County, Trust, and/or Administrator with regard to detainee health and safety.

234.   Turn Key and its executives have a business model that generates revenue through governmental contracts. Through these contracts, Turn Key assumes responsibility for the government's obligation to provide healthcare services to people who are not free to seek out healthcare for themselves.

235.   To achieve net profits, Turn Key implemented policies, procedures, customs, or practices to reduce the cost of providing medical and mental health care service in a manner that would maintain or increase its profit margin.

236.   Under the contract, Turn Key is responsible for paying for all pharmaceuticals and outside medical care costs up to a specific limit of financial liability, after which those costs are passed on to County and/or Trust.

237.   The contract also provide that Turn Key will arrange and bear the cost of hospitalization of inmates who – in the opinion of the Turn Key treating physician or medical director, require hospitalization – up to the agreed limit.

238.   These contractual provisions create a dual financial incentive to under-prescribe and under-administer medications to keep inmates, even inmates with serious, chronic medical needs, at the OCDC to avoid Turn Key incurring off-site medical costs or passing on costs to Trust and/or County and avoid Trust and County hiring a different medical provider who would limit the costs for medication and off-site medical care for the benefit of Trust and County.

239.   These financial incentives create risks to the health and safety of inmates like Plaintiff, who require specialty or outside psychiatric care and who require emergency medical care

that requires transfer to an outside facility such as a hospital, because Turn Key is making medical treatment decisions based on cost and financial repercussions instead of the needs of inmates.

240.    Defendant Turn Key was directly involved in the violation of Thomas' constitutional rights in the following manners:

**Maintaining a policy, practice, and/or custom with deliberate indifference to the violation of detainees' constitutional right to medical care**

241.    Turn Key has no protocol or clear policy with respect to the medical monitoring and care of inmates with clear, severe mental health/psychiatric needs, and provides no guidance to its medical staff regarding the appropriate standards of care with respect to inmates with clear, severe mental health/psychiatric needs.

242.    Further, Turn Key has no clear policy on how to identify inmates'/detainees' mental and/or medical symptoms and conditions which require lower-level nursing staff to contact a higher-level provider, refer an inmate/detainee to a higher level provider, or refer an inmate/detainee for care at an outside facility.

243.    During all times relevant hereto, there were no guidelines, or wholly inadequate guidelines, in place as to the standard of care and/or nursing protocols specific to detainees' mental health, inclusive of psychosis. It is common knowledge that mental health issues are prevalent in the detainee/inmate population and it is vital that jail medical providers have policies and protocols in place establishing a constitutionally permissible standard of care for jail medical personnel in order to properly provide for those detainees' medical and mental health needs.

244.    Further, Turn Key's constitutionally-deficient policies, practices, and/or customs

include:

    a.  Perpetually understaffing the OCDC in regard to medical staff, which results in a lack of timely access to needed medical care even in emergencies, and leaves detention officers to respond to respond to medical emergencies and make medical decisions without any medical training.

    b.  Widespread failures to provide necessary medical treatment to inmates/detainees with mental health and/or psychiatric needs, inclusive of failing to perform medical intakes or assessments of these individuals, failing to obtain any psychiatric care for such detainees while detained despite knowing of their condition and the risks posed to their health and safety, failing to provide access to appropriate, qualified medical professionals for evaluation, assessment and treatment, as well as failure to transfer such inmates to outside facilities for care when medical staff were aware of the need for such transfer and the inability of the OCDC's inability to care for those inmates;

    a.  Widespread failure to perform medical screening/evaluation of inmates/detainees with obvious, serious mental health/psychiatric conditions across multiple jails and multiple years, as set out in herein.

    b.  Turn Key does not review the policies and procedures of jails it operates in to ensure their own policies and procedures align with those facilities, as admitted by Turn Key Medical Director Dr. William Cooper, D.O., in a deposition given in the case *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP on February 8, 2021;

c.  Turn Key asks each jail it operates in to review Turn Key's policies to ensure their own policies and procedures align with those of the facility but does nothing to follow up on that comparison or verify that it was done, as admitted by Turn Key Medical Director Dr. William Cooper, D.O., in a deposition given in the case *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP on February 8, 2021;

d.  The failure to promulgate, implement, or enforce adequate policies and nursing protocols responsive to the serious medical and mental health/psychiatric needs of detainees like Thomas, inclusive of treating and managing mental health/psychiatric needs and identifying and responding to inmates/detainees' whose symptoms/condition require emergency medical care and/or transfer to an outside facility;

e.  Not seeing detainees for follow-up by the proper level of medical provider in a timely manner as set out by the orders of treating physicians outside of the jail;

f.  Detention of detainees with serious mental health/psychiatric needs, and/or serious emergency medical needs in the OCDC without access to the equipment, services, and specialty knowledge obviously needed to manage those conditions;

g.  Improperly and illegally delegating medical care tasks to jail medical staff beyond the legally-defined scope of their credentials and beyond their training and skill;

h.  Having LPNs as the highest-trained medical provider at the jail the majority of the time, with other providers only on-call, even though Turn Key is aware that LPNs cannot assess or diagnose any medical condition, and Turn Key admittedly does nothing to train those LPNs to assess a medical condition, as admitted by Turn Key Medical Director Dr. William Cooper, D.O., in a deposition given in the case *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP on February 8, 2021;;

i.  Severe limitation of or failure to utilize off-site medical and diagnostic service providers, even in emergent situations;

j.  Failing to perform any evaluation or assessment of the actual skills and knowledge of new hire nurses to ensure they are capable of performing the tasks delegated to them – and that they can properly determine when to refer care to a higher-level medical provider – for the care and safety of detainees, as admitted by Turn Key Medical Director, Dr. William Cooper, D.O., in a deposition given in the case *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP on February 8, 2021.

245.  These failures stem from the financial incentives to avoid the costs of off-site treatment and a failure to train and supervise medical staff in the assessment and care of inmates with serious mental health/psychiatric needs and inmates/detainees with obvious emergency medical needs, such as Thomas.

246.    Alternatively, these failures stem from County's persistent underfunding of the OCDC, continuing through the time of Thomas detention, which resulted in instruction from County and Trust to Turn Key to limit the amount of expenses incurred that would be passed on to Trust and County.

247.    Turn Key knew or should have known that jailers and medical personnel, including Defendants Turn Key Medical Staff, frequently encounter and detain individuals with serious mental health/psychiatric needs.

248.    Turn Key knew or should have known that jailers and medical personnel, including Defendants Turn Key Medical Staff, frequently encounter and detain individuals with emergency medical needs requiring care beyond that which is capable of being provided in the OCDC.

249.    Turn Key knew or should have known that jailers and medical personnel, including Defendants Turn Key Medical Staff, frequently encounter and detain individuals at heightened risk of injury or death.

250.    Turn Key knew and understood that discrepancies between Turn Key's policies and procedures and a jail's policies and procedures could lead to confusion and mistakes in the provision of care to detainees, as admitted by Turn Key Medical Director Dr. William Cooper, D.O., in a deposition given in the case *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP on February 8, 2021.

251.    Turn Key knew that because their LPNs are not trained to assess a medical condition, they may not know that an inmate is suffering a medical/mental health/psychiatric

condition that should be referred to a higher-level provider, as admitted by Turn Key Medical Director, Dr. William Cooper, D.O., in a deposition given in the case *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP on February 8, 2021.

252.   Turn Key's inadequate or non-existent policies and customs were a moving force behind the constitutional violations and injuries alleged herein.

**Deliberate indifference to the failure to train**

253.   Defendant Turn Key also failed to adequately train subordinates including each of Defendants Turn Key Medical Staff, in relation to the tasks they must perform, pursuant to the policies, practices, and or customs outlined above.

254.   As noted previously, Defendants County, Trust, and/or Administrator delegated policy-making authority to Defendant Turn Key and, therefore, the training and supervision policies, customs, and practices – or lack thereof – of Turn Key are the official policies, practices, and customs of Defendants County, Trust, and/or Administrator.

255.   Turn Key's failures in training include:

      a.   Not training its employees/nurses as to the specific policies and procedures of each jail it operates in, specifically including the OCDC, despite Turn Key's training materials indicating that such training is to be performed;

      b.   Failing to train each of Defendants Turn Key Medical Staff on when and what conditions warrant contacting a higher-level on-call or outside medical provider for the assessment, diagnosis, and treatment of detainees with serious, emergency medical needs and with mental health/psychiatric and

accompanying medical conditions and complications;

c. Failing to train medical intake personnel at the jail to perform medical evaluations of inmates with ongoing mental health/psychiatric conditions so those inmates are not deprive of care while not able to communicate all of their medical needs due to their ongoing mental health/psychiatric condition;

d. Detention of inmates/detainees with serious mental health/psychiatric needs in the OCDC when medical staff is fully aware that they are not able to properly care for such inmate/detainee, such as with Thomasand with Christa Sullivan, as discussed herein;

e. The failure to train jail medical employees on when and how to obtain assessment and evaluation of an inmate's serious medical needs from more qualified medical providers as dictated by both the standard of care within the field of nursing and within the specific field of correctional health care;

f. The failure to supervise nursing staff to identify and/or rectify when medical records clearly indicate that orders, such as performing a medical evaluation of an inmate with serious mental health/psychiatric needs, are not being completed or left undone for days or weeks at a time; and

g. Failing to perform any evaluation or assessment of the actual skills and knowledge of new hire nurses to ensure they are capable of performing the tasks delegated to them – and that they can properly determine when to refer care to a higher-level medical provider – for the care and safety of detainees.

256. These failures stem from the chronic unavailability of an on-site or responsible,

reviewing physician, financial incentives to avoid the costs of inmate prescription medications and off-site treatment and a failure to train and supervise medical staff in the assessment and care of inmates with complex serious medical needs.

257.    Turn Key knew or should have known that jailers and medical personnel, including Defendants Turn Key Medical Staff, require training in order to adequately identify, evaluate, and treat serious mental health/psychiatric conditions and to adequately identify, evaluate, and treat emergency medical needs of inmates, such as persistent complaints of worsening severe abdominal pain for days accompanied by an obviously deteriorating physical condition.

258.    Turn Key knew or should have known that its failure to adequately train jailers and medical personnel under its exercise of control, including Defendants Turn Key Medical Staff, posed a substantial and excessive risk to the health and safety of detainees, including Thomas, and would inevitably result in unconstitutional deprivation of medical of the type that Thomas suffered.

**Deliberate indifference to the need for supervision**

259.    As noted previously, Defendants County, Trust, and/or Administrator delegated policymaking authority to Defendant Turn Key and therefore the supervision policies and/or customs adopted by Defendant Turn Key are the official policies and/or customs of Defendants County, Trust, and/or Administrator.

260.    Defendant Turn Key knew or should have known that jailers and medical personnel at the jail frequently encounter detainees with severe mental health/psychiatric needs, and encounter detainees with emergency medical issues which require transfer to an outside

facility for the provision of treatment;

261.    Defendant Turn Key knew or should have known that jailers and medical personnel at the jail require supervision in order to adequately identify, respond to, and detain individuals with severe mental health/psychiatric needs, and detainees with emergency medical issues which require transfer to an outside facility for the provision of treatment;

262.    Defendant Turn Key knew or should have known that its failure to adequately supervise jailers and medical personnel under its exercise of control posed a substantial and excessive risk to the health and safety of detainees such as Thomas and would inevitably result in unconstitutional deprivations of medical care of the type Thomas suffered.

263.    Defendant Turn Key's failures in supervision include:

   a.  The failure to supervise nursing staff to identify and/or rectify when medical records clearly indicate that orders, such as to perform a medical evaluation of an inmate with mental health/psychiatric needs, are not being followed by nursing staff at all;

   b.  Failing to supervise nursing staff's care of detainees to ensure that serious mental health/psychiatric needs are being properly referred to more qualified providers for assessment, diagnosis, and treatment of accompanying conditions and/or complications;

   c.  Failing to supervise nursing staff's care of detainees to ensure that life-threatening emergency medical needs are being properly referred to more qualified providers for assessment, diagnosis, and treatment of accompanying

conditions and/or complications;

d. Failing to perform any evaluation or assessment of the actual skills and knowledge of new hire nurses to ensure they are capable of performing the tasks delegated to them – and that they can properly determine when to refer care to a higher-level medical provider – for the care and safety of detainees;

e. Failing to supervise the care of detainees under Turn Key's care to ensure that detainees are seen for follow up treatment and evaluations by properly qualified medical providers in a timely manner;

f. The failure to supervise nursing staff to identify and/or rectify when medical records clearly indicate that orders, such as performing a medical evaluation of an inmate with known mental health/psychiatric problems, are not being followed by nursing staff at all; and

g. Failing to perform any evaluation or assessment of the actual skills and knowledge of new hire nurses to ensure they are capable of performing the tasks delegated to them – and that they can properly determine when to refer care to a higher-level medical provider – for the care and safety of detainees.

264. These failures stem from the chronic unavailability of an on-site or responsible, reviewing physician and financial incentives to avoid the costs of off-site treatment and a failure to train and supervise medical staff in the assessment and care of inmates with serious mental health/psychiatric needs and with life-threatening emergency medical needs.

265. Turn Key's inadequate or non-existent policies, practices, and customs as described

herein have resulted in deaths or negative medical outcomes in numerous cases, in addition to Thomas'.

266.    Defendant Dr. William Cooper, the Medical Director and responsible/supervising physician for Defendant Turn Key, is the final policy and decisionmaker for Defendant Turn Key on the medical protocols and treatment of patients under Turn Key's care and the hiring and firing of medical staff, such that his decisions and actions are attributable to Defendant Turn Key.

267.    In the alternative, Defendant Turn Key retained policy and decision-making authority on the medical protocols and treatment of patients under Turn Key's care.

268.    Defendant Cooper and/or Defendant Turn Key were aware of and reviewed the medical records and (almost non-existent) treatment for Thomas throughout the time he was detained, pursuant to the responsibility to review and supervise the actions of all lower-level providers in the provision of care. Throughout that time and after Thomas' detention, Cooper and/or Turn Key ratified the actions and decisions of lower-level personnel and chose not to take any action to discipline, retrain, terminate, or otherwise correct the conduct of Defendants Turn Key Medical Staff, such that the actions of those employees are attributable to Defendant Turn Key.

269.    This ratification of the actions of Turn Key's medical staff in the jail by Defendant Cooper and/or Defendant Turn Key was made with full knowledge of each of the actions and failures of the Turn Key Medical Staff set out herein.

270.    The ratification of the actions of Turn Key's subordinates, with the knowledge set out above of those actions, the reasons for those actions, and the risks of constitutional

violations presented by those actions, evidences Turn Key policies and procedures that Turn Key's subordinates followed in their failures to treat Thomas, that those policies and procedures were the moving force behind denying Thomas adequate medical care and evidences deliberate indifference to the risks of constitutional violations presented by those policies and procedures.

## SECOND CAUSE OF ACTION: INDIVIDUAL SUPERVISORY LIABILILITY AGAINST BRANDI GARNER

271.   Plaintiff incorporates all prior paragraphs as is fully stated herein.

272.   Garner was directly involved in the violation of Plaintiff's Constitutional rights in the following manner:

   **I.     Maintaining a policy/ custom with deliberate indifference to the violation of citizen's Constitutional rights**

273.   Garner, in her role as Administrator of the Oklahoma County Criminal Justice Authority, maintained a policy/ custom within the OCDC of not investigating complaints made by inmates accusing other inmates of sexual harassment, misconduct, and/ or assault.

274.   Such policy is evident in this matter by Garner's choice not to investigate the complaints received about Lamb's sexual harassment, misconduct, and/ or assault prior to the sexual assault of Plaintiff.

275.   Further instances of such decisions not to investigate other complaints of sexual harassment, misconduct, and/ or assault cannot be discovered without the aid of discovery due to the nature of such policy: not publicly acknowledging such complaints and by virtue of the policy to not investigate such claims, no records exist in the public

domain which Plaintiff could obtain or reference herein.

276.   This policy was put in place/ continued with full knowledge:

    a.   Of the pervasiveness of sexual harassment, misconduct, and assault by inmates of the OCDC.

    b.   The special nature of such harassment, misconduct, and/ or assault by police officers go underreported, and

    c.   That a sexually predatory inmate would likely continue sch sexual harassment, misconduct, and/ or assault without investigation of credible complaints made against that inmate.

277.   If this policy/ custom had not been in place, the multiple complaints of sexual harassment, misconduct, and/ or assault of Lamb would have been properly investigated prior to his sexual assault of Plaintiff.

278.   Had such investigation take place prior to the sexual assault of Plaintiff, Lamb would not have been an unsupervised predator in the OCDC.

279.   Had Lamb not been an unsupervised predator in the OCDC on April 1, 2023, the sexual assault of Plaintiff would not have occurred.

280.   The decision of Defendant Garner to maintain a policy/ custom whereby credible complaints of sexual harassment, misconduct, and assault made against Lamb, and other inmates, were routinely not investigated, caused the deprivation of the Plaintiff's rights; that is, Defendants' offending policy/ custom was so closely related to the deprivation of Plaintiff's rights as to be the moving force that caused the sexual assault on Plaintiff.

281.  By reason of the aforementioned acts and omission, Plaintiff has suffered devastating and substantial mental, emotional, physical, and financial damages.

282.  Accordingly, Administrator Garner is liable to Plaintiff for damages and other relief as set forth herein.

**II.     Deliberate indifference to the failure to train**

283.  Defendant Garner, in her role as Administrator of the Oklahoma County Criminal Justice Authority, made the decision not to train officers in supervisory capacities to investigate complaints of sexual harassment, misconduct, and/ or assault by inmates under their supervision, and failed to train the detention officers to supervise and/ or discipline inmates under their supervision who have received complaints of sexual harassment, misconduct, and assault.

284.  The decision not to provide such training to detention officers was made with full knowledge:

   a.  Of the pervasiveness of sexual harassment misconduct, and assault by inmates

   b.  The special nature of such harassment, misconduct, and assault because the offenders are inmates

   c.  The incident of sexual harassment, misconduct, and/ or assault by inmates go underreported,

   d.  That a sexually predatory inmate would likely continue such sexual harassment, misconduct, and/ or assault without investigation of credible complaints made against that inmate,

   e.  That credible complaints had been made against Lamb prior to the assault on

Plaintiff,

    f.   Those supervisory officers- including Garner, Eason, Berger, and Cantrell- had failed to take any steps to investigate the credible complaints against Lamb or to place him under close supervision, solitary confinement or take any disciplinary action against him; and

    g.   That there was a high likelihood Lamb would continue the same or escalating sexual harassment, misconduct, and/ or assault.

285.   Had the obvious need for such training not been ignored prior to receiving complaints against Lamb, or if the obvious need for such training had not been ignored after the clear and obvious failure of detention officers to do anything in response to the credible complaints received against Lamb prior to his sexual assault of Plaintiff, the assault on Plaintiff would not have occurred.

286.   Had detention officers been properly trained to investigate such complaints and/ or to provide remedial training, alternative duty assignments, or discipline to inmates accused of sexual harassment, misconduct, and/ or assault Lamb would not have been an unsupervised predator in the OCDC on April 1, 2023.

287.   Had Lamb not been an unsupervised predator in the OCDC on April 1, 2023 the sexual assault of Plaintiff would not have occurred.

288.   Defendant Garner's failure to train its detention officers to receive and actually investigate complaints as well as to supervise, take predatory inmates out of cells with other inmates, or discipline such inmates, caused the deprivation of Plaintiff's rights; that is, Garner's knowing failure to train its detention officers was so closely related to

the deprivation of Plaintiff's rights as to be the moving force that caused the sexual assault on Plaintiff.

289.  By reason of the aforementioned acts and omissions, Plaintiff has suffered devastating and substantial mental, emotional, physical, and financial damages.

290.  Accordingly, Administrator Garner is liable to Plaintiff for damages and other relief as set forth herein.

### III.    Deliberate indifference to the need for supervision

291.  Garner made the decision not to take any steps to further supervise Lamb after receiving multiple complaints of sexual harassment, misconduct, and or assault by Lamb.

292.  The decision not to provide such training to detention officers, provide remedial training to Detention Officers, assign Lamb to a different cell, or to discipline Lamb in any way after receiving complaints was made with full knowledge:

   a.  Of the pervasiveness of sexual harassment misconduct, and assault by inmates

   b.  The special nature of such harassment, misconduct, and assault because the offenders are inmates

   c.  The incident of sexual harassment, misconduct, and/ or assault by inmates go underreported,

   d.  That a sexually predatory inmate would likely continue such sexual harassment, misconduct, and/ or assault without investigation of credible complaints made against that inmate,

   e.  That credible complaints had been made against Lamb prior to the assault on

Plaintiff,

    f.  Those supervisory officers- including Garner, Eason, Berger, and Cantrell- had failed to take any steps to investigate the credible complaints against Lamb or to place him under close supervision, solitary confinement or take any disciplinary action against him; and

    g.  That there was a high likelihood Lamb would continue the same or escalating sexual harassment, misconduct, and/ or assault.

293.   Had the decision not to provide such training to detention officers, provide remedial training to Detention Officers,  assign Lamb to a different cell, or to discipline Lamb in any way- despite the obvious need for such conduct- not been made, then the sexual assault on Plaintiff would not have occurred.

294.   Had Garner acknowledged the clear and obvious need to provide remedial training, alternative duty assignments, or discipline to inmates accused of sexual harassment, misconduct, and/ or assault Lamb would not have been an unsupervised predator in the OCDC on April 1, 2023.

295.   Had Lamb not been an unsupervised predator in the OCDC on April 1, 2023 the sexual assault of Plaintiff would not have occurred.

296.   Defendant Garner's failure to train its detention officers to receive and actually investigate complaints as well as to supervise, take predatory inmates out of cells with other inmates, or discipline such inmates, caused the deprivation of Plaintiff's rights; that is, Administrator Garner knowing failure to train its detention officers was so closely related to the deprivation of Plaintiff's rights as to be the moving force that

caused the sexual assault on Plaintiff.

297. By reason of the aforementioned acts and omissions, Plaintiff has suffered devastating and substantial mental, emotional, physical, and financial damages.

298. Accordingly, Garner is liable to Plaintiff for damages and other relief as set forth herein.

## THIRD CAUSE OF ACTION: NEGLIGENCE

299. Plaintiff incorporates all prior paragraphs herein as if fully set forth herein.

300. Under Oklahoma law, all defendants owed Plaintiff a duty of care to act with reasonable caution and protect him from foreseeable harm while he was in custody.

301. Specifically, the OCCJA and OCDC had a duty to establish and enforce policies to ensure detainee safety and adequate supervision, particularly for vulnerable individuals.

302. As the contracted medical provider for OCDC, Turn Key was responsible for providing adequate medical care, including physical and mental health treatment, for detainees with known cognitive or mental impairments.

303. Each of Garner, Eason, Jones, Cantrell, Berger, Waggoner, and Cooper, had specific roles in overseeing Plaintiff's safety, assessing his placement, and monitoring his mental health, carrying a duty to exercise care to protect him from harm.

304. Plaintiff's vulnerability, due to his cognitive and psychological impairments, was known to all defendants. His disabilities made him unable to protect himself from potential harm or recognize dangerous situations.

305. The foreseeable risk of harm was especially apparent when Plaintiff was housed with a violent detainee, and this risk was further compounded by the absence of adequate

monitoring, sight checks, and emergency response measures.

306. OCCJA and OCDC breached their duty by failing to create or enforce policies to prevent placing vulnerable detainees like Plaintiff in high-risk situations, neglecting to monitor Plaintiff adequately, and failing to implement basic safety protocols.

307. Turn Key breached its duty by failing to assess Plaintiff's mental health needs accurately upon intake, omitting necessary treatments, and neglecting to respond to signs of trauma following the assault.

308. Garner, Eason, Jones, Cantrell, Berger, Waggoner, and Cooper, breached their individual duties by failing to follow OCDC protocols for housing vulnerable detainees, disregarding Plaintiff's unique medical and psychological needs, and failing to act on known risks to his safety.

309. Plaintiff was placed in a shared cell with a known violent detainee without appropriate safeguards.

310. OCDC staff did not perform required sight checks or use surveillance to monitor Plaintiff's cell, neglecting to intervene during the assault.

311. Turn Key failed to conduct an adequate intake assessment, provide essential medications, or respond to Plaintiff's post-assault trauma.

312. Del City and the Del City Police Department, including Berger, had a duty of care to ensure Plaintiff's safety and well-being upon taking him into custody and during his transfer to the Oklahoma County Detention Center (OCDC). This included a duty to assess and document Plaintiff's known cognitive disabilities and mental health needs, which rendered him vulnerable to harm while in custody.

93

313.   Del City officers had a duty to inform OCDC staff of Plaintiff's mental health status and specific needs to ensure appropriate protective measures were put in place upon transfer.

314.   Del City Police officers did not conduct a thorough intake assessment or document Plaintiff's cognitive and psychiatric needs before transferring him to OCDC, nor did they adequately communicate his vulnerability to OCDC staff.

315.   Del City and Del City Police Department officers neglected to inform OCDC staff of Plaintiff's specific needs, contributing to his placement in a high-risk environment without proper safeguards.

316.   The failures by Del City and the Del City Police Department to assess and communicate Plaintiff's vulnerability and medical needs directly contributed to the conditions that led to his assault and subsequent untreated trauma within OCDC.

317.   Defendants' collective and individual failures to uphold their duties were the direct and proximate cause of Plaintiff's injuries. Their acts and omissions facilitated an environment in which Plaintiff suffered significant physical and psychological harm.

318.   The failure to protect Plaintiff from foreseeable harm, as well as the neglect of his medical and psychological needs, resulted in lasting trauma, necessitating long-term mental health care.

319.   As a result of Defendants' negligence, Plaintiff has suffered severe mental and emotional distress, physical pain, and trauma, requiring ongoing psychological treatment and support. Plaintiff's quality of life and independence have been irreversibly impacted.

320.    Plaintiff seeks compensatory damages to cover medical expenses, pain and suffering, and any additional costs associated with long-term care resulting from Defendants' negligence.

## FOURTH CAUSE OF ACTION: NEGLIGENT HIRING, TRAINING, AND SUPERVISION

321.    Plaintiff incorporates all prior paragraphs herein as if fully set forth herein.

322.    Defendants OCCJA, OCDC, and Turn Key had a duty to ensure that all personnel responsible for detainee care, supervision, and medical treatment were properly qualified, trained, and competent to perform their roles.

323.    Additionally, Del City and the Del City Police Department, including Berger, were responsible for hiring, training, and supervising officers tasked with detainee intake and transfer. They had a duty to ensure that officers were capable of recognizing and addressing the needs of individuals with cognitive disabilities and were trained to communicate essential information to receiving facilities.

324.    Del City and the Del City Police Department, including Berger, failed to hire officers with sufficient qualifications and experience in handling detainees with mental and cognitive impairments. Del City and the Del City Police Department, including Berger, failed to hire officers with sufficient qualifications and experience in handling detainees with mental and cognitive impairments. Del City Police Department supervisors, including Berger, did not enforce or monitor adherence to policies for communicating special needs of detainees with cognitive or mental impairments, leading to inadequate communication with OCDC.

325.    Given Plaintiff's known mental and cognitive impairments, Defendants' duty was heightened, requiring them to hire and retain staff capable of recognizing and

responding appropriately to individuals with special needs.

326. These entities employed staff without adequately verifying their qualifications, background, or experience in handling detainees with cognitive disabilities and psychological vulnerabilities.

327. Turn Key routinely hired medical staff who lacked the experience or specialized training necessary to manage high-risk detainees with mental health needs.

328. Defendants failed to establish effective training programs that instructed employees on the proper management and supervision of vulnerable detainees like Plaintiff. OCDC's two-week training program did not provide sufficient instruction on safeguarding individuals with disabilities or addressing emergencies involving mental health crises.

329. Staff were not adequately trained on how to conduct sight checks, use surveillance tools for monitoring, or recognize signs of distress in detainees with cognitive impairments.

330. Turn Key's training programs neglected to include essential instruction on recognizing and treating trauma-related symptoms and ensuring detainees received prescribed medication and necessary mental health support.

331. Defendants failed to provide effective oversight and supervision of their employees, allowing unqualified and inadequately trained personnel to continue working with vulnerable detainees without correction.

332. Supervisory personnel, including Garner, Eason, and other named officials, neglected to enforce policies that required protective measures for detainees like Plaintiff.

These policies were disregarded, leaving Plaintiff exposed to a dangerous environment without adequate oversight.

333.  Supervisors ignored repeated complaints, internal reports, and documented deficiencies within OCDC and Turn Key, continuing to allow unqualified staff to manage detainees with serious mental health needs.

334.  Defendants were aware of prior reports, complaints, and recommendations from state investigations that identified deficiencies in hiring, training, and supervision within OCDC and Turn Key. These warnings were disregarded, allowing for the continuation of harmful practices.

335.  Turn Key prioritized cost-saving measures, often at the expense of providing qualified staff and thorough training, which contributed directly to Plaintiff's lack of adequate care and supervision.

336.  Defendants' failure to hire, train, and supervise qualified personnel was the direct and proximate cause of the conditions that allowed Plaintiff to be assaulted and left untreated following the assault.

337.  This systemic neglect created an environment where Plaintiff's safety, mental health, and well-being were severely compromised, resulting in lasting trauma and medical needs.

338.  As a result of Defendants' negligent hiring, training, and supervision, Plaintiff has suffered significant emotional distress, physical pain, and long-term psychological harm. Plaintiff requires ongoing mental health care and support due to the failure of Defendants to uphold their duties.

339.    Plaintiff seeks compensatory damages for his injuries, including the costs of necessary long-term medical and psychological treatment.

### FIFTH CAUSE OF ACTION: NEGLIGENCE

340.    Plaintiff incorporates all prior paragraphs herein as if fully set forth herein.

341.    Turn Key Health Clinics, LLC, as the contracted healthcare provider for OCDC, owed Plaintiff a duty to deliver reasonable and appropriate medical and mental health care while he was detained.

342.    Turn Key was required to provide medical assessments, necessary medications, and mental health interventions in accordance with professional standards, particularly for detainees with documented mental health and cognitive disabilities, like Plaintiff.

343.    Upon Plaintiff's intake, Turn Key failed to conduct a thorough evaluation, disregarding his known psychiatric and developmental disorders. This failure included the omission of a comprehensive mental health assessment that would have flagged him for additional observation and protection.

344.    Turn Key did not perform a risk assessment that would have identified Plaintiff as particularly vulnerable to post-traumatic stress or further trauma within the jail environment.

345.    Following the assault, Plaintiff exhibited clear signs of psychological distress, including withdrawal, panic, and heightened anxiety, which Turn Key failed to address with appropriate mental health interventions.

346.    Plaintiff was denied access to necessary medications that were either prescribed previously or should have been administered in response to his post-assault

condition. Turn Key also failed to initiate observation protocols for detainees in psychological crisis.

347.    Turn Key's policy to reduce operational costs led to understaffing, inadequate training, and insufficient mental health resources, directly impacting Plaintiff's care. This prioritization of profit over professional standards prevented Plaintiff from receiving essential medical attention.

348.    Turn Key did not maintain or follow appropriate protocols for handling trauma-related incidents, leaving Plaintiff's mental health needs neglected even in a critical post-assault period.

349.    Given Plaintiff's deteriorating mental health, Turn Key had an obligation to refer him for emergency psychiatric intervention, especially after the assault. Turn Key's failure to arrange for outside care or specialized services constitutes a breach of its duty of care.

350.    Turn Key's failure to provide timely, adequate, and appropriate medical and mental health treatment was the direct and proximate cause of Plaintiff's worsening psychological state and ongoing trauma.

351.    This neglect has led Plaintiff to experience prolonged mental health issues, requiring long-term psychological care and support.

352.    As a result of Turn Key's negligence, Plaintiff has suffered significant mental and emotional distress, ongoing psychological trauma, and physical health issues stemming from untreated injuries. Plaintiff requires continuous medical and psychological care due to the exacerbation of his conditions.

353.    Plaintiff seeks compensatory damages to cover the cost of necessary medical treatment, pain and suffering, and any additional expenses associated with his prolonged care needs resulting from Turn Key's negligence.

## PUNITIVE DAMAGES

354.    Plaintiff incorporates all previous allegations and statements herein.

355.    Plaintiff is entitled to punitive damages on the claims brought against the individual Defendants pursuant to 42 U.S.C. § 1983 as Defendants' conduct, acts, and omissions alleged herein constitute intentional, reckless, or callous indifference to Plaintiff's Constitutionally-protected rights.

356.    Further, Plaintiff is entitled to punitive damages on the claims brought against Defendant Turn Key pursuant to 42 U.S.C. § 1983 as Turn Key's conduct, acts, and omissions alleged herein constitute intentional, reckless, or callous indifference to Plaintiff's Constitutionally-protected rights.

357.    Further, Plaintiff is entitled to punitive damages on the claims brought against Defendant Turn Key pursuant to laws of the State of Oklahoma as Turn Key's conduct, acts, and omissions alleged herein constitute intentional, reckless, or callous indifference to Plaintiff's rights.

## DEMAND FOR JURY TRIAL

358.    Plaintiff demands a jury trial for all issues of fact presented by this action.

## RESERVATION OF ADDITIONAL CLAIMS

359. Plaintiff reserves the right to plead further upon completion of discovery, to state additional claims and to name additional parties to this action.

## CONCLUSION

WHEREFORE, Plaintiff, Stephanie Hawley, individually and as Legal Guardian of Thomas Hawley, prays for judgment against Defendants in a sum in excess of the amount required for diversity jurisdiction ($75,000.00) plus interest, attorneys fee, costs, and all such other relief as to which Plaintiff may be entitled.

Respectfully submitted,

LAIRD, HAMMONS, LAIRD, PLLC

Chris Hammons, OBA # 20233
Jason M. Hicks, OBA# 22176
1332 S.W. 89th Street
Oklahoma City, OK 73159
Telephone:    (405) 703-4567
Facsimile:    (405) 703-4061
E-mail: chris@lhllaw.com
           jason@lhllaw.com
ATTORNEYS FOR PLAINTIFF

**ATTORNEY LIEN CLAIMED**

101